FREDERICKA HOMBERG WICKER, Judge.
|2This is an appeal by Lucien Miranne, Jr., defendant/appellant, from the judgment totaling $435,513.69, with interest, in favor of Christopher Ezzell, plaintiff/appel-lee, in his intentional delictual action. Ez-zell has also answered the appeal. For the following reasons, we award Ezzell an additional $75,000 for future pain and suffering. In all other respects, the judgment is affirmed.
Facts and Procedural History
The underlying facts, i.e., that Miranne struck Ezzell, are not seriously in dispute. On January 4, 2008, Miranne, his wife, their daughter and their son, went to Oscar’s, a bar and grille, to play pool. While Miranne and his son were at the bar ordering drinks, his wife and daughter sat down at a table. A waitress asked Mir-anne’s daughter for an ID, and because the 19 year old did not have one, she was told to leave, which she did. When Mir-anne arrived at the table and learned what had happened, he began arguing with the waitress. His wife and son left the [,-.building at that point, and Miranne went back to the bar and paid the tab. Miranne continued to be so boisterous that another waitress decided to call the police. As Miranne was leaving he passed behind Ez-zell, who was sitting on a bar stool facing the back bar and waiting for a to-go order. Ezzell turned toward Miranne and told him he should just leave. Ezzell and three disinterested witnesses all testified that Ezzell then turned back toward the back bar. They all agreed that Miranne passed Ezzell, then suddenly turned and came back toward him, and punched him on the right brow. Miranne’s version was that Ezzell called him an “a-e,” that he then turned to confront Ezzell face to face, and at that point he thought that Ezzell had moved his upper body toward him in what he considered a threatening manner so he hit him. There is no dispute that Ezzell did not raise his hands or arms and was thus defenseless when struck. After the blow, Miranne left the building.
*645 Ezzell filed a petition for damages alleging serious injury as a result of Miranne’s punching Ezell in the face.
Intentional Tort
The jury determined that Miranne had committed an intentional tort, but also found that Ezzell had contributed to the incident. It apportioned 95% of the fault to Miranne and 5% to Ezzell. Miranne does not contest the fault determinations made by the jury. He does urge, however, that the trial judge erred in not reducing the total damage award made to Ezzell by his contributory negligence of 5%. We disagree.
La.C.C. art. 2323(C) provides that when a person suffers injury partly from his own negligence and partly as the result of an intentional tort, his recovery shall not be reduced by the percentage of his own negligence. The issue here is whether Ez-zell’s actions constituted negligence or an intentional tort on his part. An almost identical factual situation was presented in Daniels v. Essex Ins. Co., 04-579 (La.App. 5 Cir. 11/30/04), 890 So.2d 599. There, a man and a woman got into an argument at a bar. The man kicked the woman in the stomach and punched her in the jaw. The trial judge determined that the woman was partially at fault for engaging in the argument, but declined to reduce her recovery because her behavior did not amount to an intentional tort. This Court affirmed that judgment. Daniels, supra, 04-579 at 4, 890 So.2d at 602. We similarly find here that Ezzell was at most improvident in injecting himself into a dispute that appeared to have resolved itself when Miranne started to leave the bar. However, his actions clearly did not constitute an intentional tort, and therefore, even though his actions contributed to his injury, his damages may not be reduced.
The Awards
The more serious disputes here concern the severity of Ezzell’s injuries, and the effect that those injuries had on his employment. When Ezzell was struck, he fell off of the bar stool onto the floor. He was dazed, but it does not appear that he ever lost consciousness, and after a brief time on the floor he got up. He then proceeded out of the bar to see if he could further identify his assailant. It turned out that Miranne lived a few blocks from the bar and that he and his family had walked there from his house. Ezzell encountered the Mirannes on the street and there were discussions among them about the incident, but no further violence occurred. Ezzell learned Miranne’s identity and then returned to the bar. Several hours later, Ezzell drove himself to the East Jefferson General Hospital emergency room where he was examined by Dr. Gregory Caplan.
Dr. Caplan testified for the defense as an expert in emergency medicine. He identified the hospital record of the morning of January 5, 2008. According to that record, he examined Ezzell at 12:19 AM on January 5, 2008. Ezzell sustained a two centimeter laceration just above his right eyebrow. This is roughly the width [ 5of his thumb. He repaired the laceration with two sutures. Ezzell did not complain that he lost consciousness. He did not indicate that he had any amnesia. Ezzell did not complain of any other problems associated with being punched. Dr. Ca-plan performed a complete examination. That examination was negative except for the laceration. Ezzell did not exhibit any abnormal neurological deficits. He did not appear to have sustained a concussion.
Over the next several days, Ezzell began complaining of increasingly severe headaches. On January 9, 2008, he saw Dr. D.C. Mohnot, a neurologist specializing in the treatment of headaches. Over the *646 next few days, this doctor ordered a CAT scan which was normal. An EEG showed mild abnormalities, but “nothing specific to talk about.” An MRI was similarly normal. His diagnosis as of January 14 was a closed head injury with post-traumatic “intractable headaches.” The doctor prescribed medications for the headaches. Ezzell returned for a January 23 visit still complaining of headaches, but additionally exhibiting slurred speech, slow thought processes, decreased word finding ability and impaired memory. He also reported that he had been sent home from his job because of these problems. He returned to Dr. Mohnot several times during February still complaining of headaches, and his medications were adjusted to try and find the best drug for his complaints. A second MRI done during this period was also normal. A third MRI done in March 2009 was also normal.
Dr. Mohnot saw Ezzell as recently as a month before trial and found that the medications he prescribed for the headaches had not yet resolved his problems. He had not released Ezzell to return to work because he continued to have symptoms with headaches and memory. In July 2008, Ezzell complained of tremors.
On August 14, 2008, Dr. Mohnot ordered a spec scan, a diagnostic tool to show the blood flow in the brain. Dr. Mohnot testified that the spec scan was not | ¿indicative of a brain injury. Further, the fact that Ezzell’s MRI and CAT scans were normal did not mean there was no head injury. It is more the rule than the exception that patients suffering mild head trauma or mild head injury show normal findings on MRI and CAT scans. Dr. Mohnot testified that the more frequent and intense the headaches, the less chance there is for long-term recovery.
Dr. Mohnot testified that in his opinion, the cognitive deficiencies regarding memory, speech, stuttering, and forgetfulness were related to the January 4, 2008 incident. He opined that at the time of trial, Mr. Ezzell had a poor prognosis for recovery. He testified that given the history of no headaches or cognitive symptoms before the incident, he would relate the headaches and the cognitive problems to Ez-zell’s head trauma of January 4, 2008. He testified that it was absolutely correct that the loss of consciousness was not necessary in order for the headaches to be related to the head trauma. Although most patients with mild head injury recover within weeks or months, a small number of patients, about 15 to 20 per cent, continue to have the symptoms and those symptoms can last for years. In his opinion, Ezzell’s age and pre-existing bipolar disorder, along with other predictors like pre-existing psychological problems, definitely would make it difficult to treat his symptoms and they would last much longer than a younger person with no previous medical history. He did not find that Ez-zell exaggerated his symptoms. He found him to be truthful.
Dr. Mohnot was referred to Dr. Corey Ann Conn’s diagnosis that Ezzell had medication overuse headaches. Dr. Mohnot disagreed with that diagnosis. He testified that when he examined Ezzell, he appeared to be confused, stuttered, and shopped for words. He did not notice that the longer he talked to him, the more fluent he became. Although sleep deprivation is one of the triggers for migraine |7type headaches, his headaches were different from the regular typical migraine headaches. Ezzell never had headaches like this before the head trauma.
At some point, Dr. Mohnot decided to refer Ezzell to Dr. Susan Andrews, a neu-ropsychologist, for testing because he was complaining of memory problems.
*647 Dr. Andrews, a neuropsyehologist, testified that about 30 to 40 per cent of her practice involves testing for cognitive/brain dysfunctions resulting from head trauma. She noted that many types of dysfunction do not show up on MRIs, CT scans, or x-rays, but are nonetheless real. She administered a battery of tests to Ezzell in 2008. The first time was two months after the incident. At that time, she discerned several problems that he had reported to Dr. Mohnot. He was stuttering, had trouble finding appropriate words, his attention and concentration were impaired, he demonstrated significant memory problems, he was easily confused, took an abnormal amount of time to process information, and had difficulty multitasking. He was also anxious and depressed. She reviewed his prior medical history which showed that before the incident here, he suffered from a bipolar disorder with consequent anxiety and depression, but that none of the other symptoms revealed in the test were present before the blow to the head. She recommended that he undergo speech, occupational and physical therapy. After he went to eight months of therapy, she retested him. At that time, he showed a great deal of improvement. The fact that he showed improvement was inconsistent with someone trying to fake results. After therapy, however, he was still having problems with speech, particularly when he was stressed. He also still continued to have some word finding problems, problems with attention and concentration, and problems multitasking. He was prone to being confused when he had trouble figuring out what words meant.
|8Pr. Andrews testified that it is true that a number of people who have mild concussions or mild injury do not have long-term problems; however, in some cases they do. Someone like Ezzell who is already fairly fragile because of his age and his medical history, is likely to have long-term problems. And when such an individual improves over time, this indicates that something caused the initial problem. She did not believe that Ezzell was faking his symptoms. She thought he was giving full effort each time she tested him. Her diagnosis is that he has a cognitive disorder, not otherwise specified, bipolar disorder by history, and that part of his cognitive disorder was his expressive aphasia. He also has sleep problems. Her prognosis is that he has reached maximum improvement. She was asked whether she believed to a reasonable degree of neurop-sychological expert probability that Ezzell suffered debilitating cognitive damages as a result of the punch by Miranne. She replied affirmatively.
On cross-examination, she admitted that the larger percentage of people who have mild injury to the brain are fully recovered within about three months to a year. She agreed that the majority of individuals who alleged cognitive deficits more than three months after an injury where there is no loss of consciousness and no amnesia are reportedly associated only with those persons who are involved in litigation or who are seeking compensation. She did not, however, believe that this was the case with Ezzell.
On redirect examination, she agreed that the literature stated that for most people, post-concussion syndrome symptoms resolves within three months, although, symptoms can persist for a year or more. If these symptoms continue or- persist for two years or more, as in Ezzell’s case, the likelihood is that they are permanent. She agreed that the medical research generally supports the concept that chronic post-traumatic headaches and post-concussion syndrome are the result |9of an injury to the brain. And, that often the injuries are subtle that they cannot be *648 seen on CT’s or MRIs but can be demonstrated by neuropsychological testing.
In May, 2008, Ezzell saw Anna Lee Zorthian, a speech pathologist specializing in brain injury patients, at Touro Hospital. She noted that he stuttered, was slow of speech, mixed up words and sounds, and had writing problems. Testing showed a moderate short term memory deficit and reasoning problems. She treated him three times per week from May to October, 2008, and then twice a week through January, 2009. She discharged him from therapy in February 2009. She felt that he could do just as well with the home program that she developed for him. Although she discharged him in February 2009, he returned August 26 to September 26, 2009. He wanted to see if there is anything new that he could do. She tested him again and found nothing had really changed. Between the time that she discharged him in February 2009 until September 2009, he was slightly improved. But, the cognitive deficits persisted and had not changed. She last saw him in September, 2009, at which time she found him still moderately impaired, but somewhat better than when treatment began. She found his complaints to be consistent with that of other head injury patients that she had seen.
In August, 2008, while Ezzell was undergoing therapy, he saw Dr. John Thompson, a forensics psychiatrist, to ascertain whether there were psychiatric problems that might respond to treatment. This doctor reviewed all of the medical records and concluded that the treatment he was receiving was appropriate. In a nutshell, he found that Ezzell came to the punching incident with some pre-existing conditions. One of these was bipolar disorder. After the punching, he experienced additional symptoms, some of which were consistent with his bipolar disorder and some of which were consistent with post-traumatic stress disorder. Dr. Thompson thought that Ezzell would have a hard time returning to work. . Although Ezzell J^appeared to be relatively stable on his biPolar medications, that plus the cognitive deficits make it difficult for him to return to the level of employment that he had before the incident. He also stated that the idea that Ezzell was a malingerer was “preposterous.” He agreed with Dr. Andrew’s analysis that the fact that he improved on the second testing by her indicated that he was not a malingerer.
Prior to trial in April, 2010, Dr. Andrews reviewed again all of Ezzell’s medical records. She noted that Ezzell had been treated for his bipolar disorder since 2003 by Dr. Alvin Rouchell, a psychiatrist. This doctor’s records showed that he placed Ezzell on a regime of medications to control his mood swings and depression. However, nothing in those records showed that Ezzell had ever complained of any of the verbal and cognitive symptoms that developed after he was struck. Dr. Rouc-hell confirmed this observation in his testimony.
Dr. Rouchell testified that before January 2008, Ezzell had not had, to his knowledge, suffered or expressed to him problems with headaches, stuttering, forgetfulness, trouble pronouncing and finding words, or tremors. This doctor never saw any of those symptoms before then. The symptoms were absolutely not a result of his bipolar condition. He thought that the depression Ezzell suffered before 2008 became worse after January 2008. In his opinion, Ezzell’s bipolar condition has been stable and under control since January 2008. He testified the last time that he saw Ezzell was March 4, 2010. Since the stuttering, memory problems, and comprehension problems were not there before the incident, he assumed in *649 his opinion that they were related to the incident.
In April 2009, Dr. John Wakeman, a clinical neuropsychologist and chief of psychiatric services at Ochsner clinic, reviewed Ezzell’s records to see if this doctor could offer further treatment. Dr. Wake-man reviewed the past medical records. He noted the intense cognitive therapy Ezzell had received at Touro In Hospital and was of the opinion that he could not be of further service to Ezzell, and that he had reached maximum recovery. He believed that the primary contributing factor to his problem was the blow to the head. He testified that loss of consciousness is not considered necessary for traumatic brain injury, but this is a controversial issue among the experts.
The defense offered the testimony of three doctors, all of whom thought that Ezzell’s alleged symptoms were not reasonably related to the blow to his head.
Dr. Donald Sanders Adams, a neurologist, examined Ezzell on November 9, 2009. He also reviewed medical records. He checked his cranial nerves, which control facial movements as well as hearing, smell and taste, and found these normal. Coordination and fine motor skills were normal. He particularly noted that Ezzell claimed not to be able to do a “tandem” walk, i.e., putting one foot in front of the other, and demonstrated his awkwardness in this maneuver. However, he was able to stand on one foot at a time. He noted that Dr. Carol Barton, a neurologist, reported that his tandem gait was normal about two months after the injury, and the inconsistency with poor tandem gait at the time he saw him was “neurologieally impossible.” He opined that if a person had balance problems after moderate or severe head injuries, they would have them two months after the injury and not two years later. Also, he felt that a person could do both or neither, but not one and not the other. He also found that while Ezzell stuttered at first, after a while he became fluent. He noted that this behavior of improved fluency was reported as well by Dr. Barton, who saw him about two months after the injury. He also noticed that the stutter was atypical in cadence. He expressed concerns about Dr. Andrew’s test for malingering and found the results problematical. He explained that the first three hours are critical in assessing the level of brain injuries. When there is no loss of consciousness, anemia, or 112confusion, the injury was mild and would resolve itself in a short time. His conclusion was that there was no physical basis to explain how the injury could have caused persistent symptoms for the length of time involved here.
Dr. Julian Bailes, a neurosurgeon specializing in brain injuries, did not examine Ezzell, but he did review most of the medical records. He reviewed the East Jefferson General Hospital record. He determined that Ezzell did not suffer any loss of consciousness as a result of being struck by Miranne. He had no signs of amnesia, neurological deficits, or tremors. The approximate size of the laceration above his right eyebrow was two centimeters (2.54 centimeters is an inch). He agreed with Dr. Adams that there was no evidence of any permanent brain damage that could explain Ezzell’s symptoms. He also agreed that the first hours after an injury are when symptoms appear, not days or weeks later. As indicated from Dr. Moh-not’s records, testing was normal. Dr. Bailes disagreed with Dr. Mohnot’s diagnosis of mild cerebral dysfunction because the testing showed no traumatic abnormality. And he did not see in the history any loss of consciousness, amnesia, or any change in the level of alertness or the patient’s ability to function normally. He *650 did not see any evidence in the history, physical exam, or any x-ray or any radio-graphic evidence by CAT scan or MRI that there was any permanent injury here. He has had experience with seeing or studying several thousand head injury cases. He believed that in order to have a mild traumatic brain injury, there must at least be a mild concussion. One of the signs of concussion is to be knocked out or to lose consciousness. He did not see that in this case. Based on medical records and the history, he would not have diagnosed him as having a concussion. He did not believe that Ezzell had a long-term chronic brain damage. Ezzell had a normal examination right after the incident when he went to the hospital.
11sOn cross-examination, he testified that he reviewed the neuropsychological testing on Ezzell by Dr. Andrews, but he did not agree with it. He also testified that the lack of abnormal findings on MRI or a CT scan of the brain did not conclusively mean that a head injury had not occurred. Mild head trauma could have negative findings on radiographic studies such as a CAT scan and MRI. Mild head trauma headaches are one of the symptoms of mild head trauma. In general, a blow to the head and fall to the floor can cause a mild head injury. If Ezzell had an alteration of consciousness, it is most likely that he sustained a concussion. On redirect examination, he testified that he did not see in the medical records any indication that Ezzell had an alteration of consciousness.
Dr. Megan Ciota, a neuropsychologist, examined all of the records. She, too, noted that there was no loss of consciousness (as did Drs. Bailes and Adams) or amnesia immediately after the trauma. Her opinion was that the injury was “mild at worst” and that such injuries do not cause permanent problems. She also found from the results of Dr. Andrew’s test that Ezzell was exerting poor or sub-optimal effort during the tests. Finally, she cited a substantial body of literature on mild brain injuries which generally concluded that almost all people with such injuries who suffered long-term symptoms were either involved in litigation or were suffering from some pre-existing psychological problems.
In regard to Ezzell’s work performance, Robert Winn, Ezzell’s supervisor at CNA, testified that Ezzell was hired in 2003. Winn testified about Ezzell’s work performance before and after the incident. He said that Ezzell was one of his best adjusters and handled a substantial workload. He said that he knew of the bipolar problem, and that it never to his knowledge interfered with work. After the incident, he noted that Ezzell could not perform his job. He placed him on short-term disability in February 2008 and converted back to long-term disability which [ 14ran until August 2008. At that point Ezzell was terminated. He said that Ez-zell wanted to come back to work, but he simply could no longer do the job. He listed Ezzell’s salary, including bonuses, at about $70,000 per year.
Todd M. Powers, a Cincinnati attorney, testified that around 2003, he began working with Ezzell on claims. Ezzell excelled as a claims representative. Powers saw no problems with Ezzell’s memory and Ezzell never mentioned he suffered from headaches. Before the incident, Powers saw no problems with Ezzell’s ability to formulate ideas. Powers has had telephone conversations with Ezzell and has seen Ezzell on occasion after the incident. Powers testified that he was troubled by the change in Ezzell after the event. After that, Ezzell was difficult to understand. Ezzell was halting in speech. He had memory problems such as difficulty remembering names and articulating words. Powers *651 saw a remarkable difference after the incident.
In regard to his employability, Ezzell, who was 55 years of age, saw Thomas Meunier, a vocational rehabilitation expert, on December 26 and 29, 2008. Mr. Meunier was given a history of Ezzell’s work experience and found that his employment with CNA as a marine insurance claims adjuster was a highly skilled position. He administered a number of tests, and found very sub-par reasoning and problem-solving skills, low language skills, as well as visual and auditory perceptual deficits. He also found him emotional and sad. His conclusion then was that he was unemployable, even at unskilled labor, at that time. He saw him again several months later in August 2009, and did not change his opinion. He testified at trial that if Ezzell was not better by then, then he did not anticipate any improvement in his employability. He also found Ezzell truthful and extremely motivated to do well on the testing and ruled out malingering.
|1BPr. Kenneth Boudreaux, a professor of finance and economics, testified that his estimate for the total past and future economic loss of earning capacity is $1,646,403 based on a retirement age of 75. With a retirement age of 70, that figure would be $1,296,111. Among the factors he considered was Ezzell’s 2007 income of $70,676, which had been relatively stable in the years prior to that. In addition to the $70,000, he also had approximately $14,000 of coaching earnings. He separated past lost earnings from future lost earnings. Past lost earnings is mostly just an arithmetic calculation. From the date Ezzell was last paid in mid-February 2008 up until mid-June 2009, he simply multiplied the wage base, the $84,700, by that period of time and arrived at $114, 110. His past wage loss was $114,110.
Dr. Boudreaux calculated the loss of future earning capacity. If Ezzell would have worked until he was 70 years of age, his future loss of earning capacity would be $1,031,028. If he had worked until age 75, the amount would be $1,340,518.
If he were to calculate the amount of fringe benefits, his figures would change. There would be an additional 15.8% as fringe benefits added to the wages. For past wages, that would be an additional $15,043. At age 70, future wages would add an additional $135,900 to the amount. At age 75, an additional amount of $176,730 would be added. The total loss, including the benefits, past and future, if he assumed that Ezzell worked until age 70, is $1,296,111. If he assumed he would worked until age 75, the past and future loss totals $1,646,403. He based the 70 and 75 years as requested by Ezzell’s counsel rather than use 65 or 63.
On the basis of the above evidence, the jury awarded Ezzell $25,000 for past pain and suffering, $140,000 for past lost wages, and an additional $140,000 for future lost wages. They also awarded him $130,513.69 in medical costs. Miranne | purges here that the awards for past and future lost wages are not supported by the evidence and that the medical bills submitted were in part payment for expert testimony, rather than treatment actually rendered. Ezzell argues that the lost wages are too low, and that the jury verdict is inconsistent in awarding future lost wages without a corresponding award for future pain and suffering.
As a general rule, awards for past and future lost wages are considered special damages, i.e., those which can be established to a reasonable mathematical certainty. Cottle v. Conagra Poultry Co., 06-1160, p. 3 (La.App. 3 Cir. 3/14/07), 954 So.2d 255, 256 (citation omitted). When a trier of fact assesses such damages, while *652 the discretion is more limited than that for general damages, the standard of review is still that of abuse of discretion. Id., citing Wainwright v. Fontenot, 00-492 (La.10/17/00), 774 So.2d 70. Also, in reviewing a jury’s factual conclusions with regard to special damages, there must be a reasonable factual basis for these conclusions and they must not be clearly wrong. Guillory v. Ins. Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029, 1032.
In the present case, the evidence showed that Ezzell was earning just under $70,000 per year in his job with CNA. There was also evidence that he earned about $14,000 coaching soccer teams, but these earnings had been on a steady decline during the previous several years. In awarding $140,000 in past wages, it is evident that the jury determined that the injury had resulted in this loss of earnings for about two years. The injury was on January 4, 2008, and trial was in April, 2010, a little over two years later, but there was also testimony that Ezzell had received short and long term disability payments for some of this period, so the two year figure was reasonably based on the evidence. All of his treating physicians were of the opinion that the blow to the head was responsible for the various symptoms that rendered him incapable of employment during that time. |17Although there was conflicting testimony on this point, it was reasonable for the jury to accept the opinions of plaintiffs doctors rather than those of the defendant’s experts. Plaintiffs credibility was challenged by defense witnesses. In light of the conflicting nature of the evidence presented at trial, we cannot say that the jury’s verdict was unreasonable. In this circumstance, we may not set aside these credibility determinations. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 881 (La.1993). Because there was a reasonable basis for the award, we must affirm it.
It similarly appears that the jury found that Ezzell would be incapable of returning to work for another two years because it awarded him an additional $140,000 for future lost wages. Again, the inquiry is whether there was a reasonable basis for this finding, and whether it is manifestly erroneous. The testimony of plaintiffs experts was that Ezzell was permanently disabled from ever returning to work of any kind, and that he had reached maximum recovery by the time of trial. Defendant’s experts were equally in agreement that the nature of Ezzell’s injury could not have caused the symptoms for more than a few months. Dr. Adams testified that the fact that Ezzell claimed he could not do the tandem walk, i.e., putting one foot in front of the other, but could stand on one foot, was impossible from a neurological standpoint. He noted that he found it strange that Ezzell stuttered at the beginning of his examination, but then began speaking normally, and he further noted that there was an unusual cadence in the stuttering. He also found fault with Dr. Andrews’ tests for malingering. Similarly, Dr. Ciota believed plaintiff to be a malingerer. Dr. Bailes found no physical explanation for Ezzell’s complaints. It is apparent that the jury was not convinced that Ezzell was permanently disabled, but equally apparent that it believed that he had suffered an injury sufficient to prevent his return to work for another two years. In this Court’s |18view, this was a reasonable compromise based on the disputed expert opinions. And as with past lost wages, because we find no clear error in this award, we must affirm it.
Plaintiff, for his part, urges that the award for future wages without a corresponding award for future pain and suffering and mental anguish constitutes an *653 impermissible inconsistency. The issue of whether general damages must always accompany an award for special damages was discussed at length in Wainwright v. Fontenot, supra. There, the court concluded that there is no bright line rule, but rather that each case depended on its particular facts. It noted that there are two lines of cases involving this question. One line, exemplified by Bienvenu v. State Farm Mut. Auto. Ins. Co., 545 So.2d 581 (La.App. 5th Cir.1989), involves situations where a plaintiff has objective symptoms of injury. In such cases, the jury errs in awarding medical expenses, but no general damages. The other line of cases, including Wainwright v. Fontenot, involves situations where a plaintiff seeks medical attention to ascertain whether he has indeed suffered injuries. If a jury finds that there were no injuries, it may still award medical expenses to a plaintiff who has sought medical advice to insure that he was not injured.
The present case falls into the first category. There is no question that the jury found that plaintiff would not be able to return to work for two years. The only way that it could have reached this conclusion was by finding that he was still suffering in some degree from the symptoms brought about by the blow. In this circumstance, the jury abused its discretion in not making a general damage award for future pain and suffering.
Having determined that it was improper not to award general damages, the next question is what amount would fairly compensate plaintiff for these damages. In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1258, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the court set forth the analysis to be used by appellate courts in fixing awards when the trier of fact has abused its much discretion. The court noted that the inquiry must first be on the particular effects of the particular injuries on the particular plaintiff at hand. Only after the appellate court, for articu-lable reasons, determines that the trier of fact abused its much discretion may the court turn to awards made in similar cases for guidance, but always keeping in mind the particular facts of the case under review. Moreover, in making the award, the court may only fix it at the lowest amount reasonable on the record where the fact finder has made too low an award, or at highest reasonable amount when the fact finder has made too high an award.
Here, we have determined that the jury abused its much discretion in making no award for future pain and suffering. We now turn to cases involving similar damages to determine what the lowest award should reasonably be, keeping in mind all of the particular circumstances of the case. In Brasseaux v. Town of Mamou, 97-1540 (La.App. 3 Cir. 5/20/98), 713 So.2d 742, 745, 755, reversed on other grounds, 99-1584 (La.1/19/00), 752 So.2d 815, plaintiff was struck in the head with either a pool cue or a Billy-stick during an altercation at a bar, and suffered a closed cranial injury. His diagnosis was post-concussive syndrome with cognitive disorders. His symptoms included significant memory loss, attention and concentration deficits, cognitive decline, emotional and behavioral changes, depression, and headaches. These symptoms rendered him at least partially-permanently disabled. The court found that a $250,000 award for general damages was reasonable. In Smith v. Lee, 00-1079 (La.App. 5 Cir. 4/11/01), 783 So.2d 642, 643-44, 645-46, writ denied, 01-1731 (La.9/28/01), 798 So.2d 116, plaintiff was struck in the head by a low lying tree branch during a parade. Her symptoms 12nincluded severe migraine headaches sev *654 eral times per month, depression and a speech disorder. The headaches were predicted by her doctor to persist for her lifetime. The jury awarded her $16,000, which the trial judge raised by way of a JNOV to $200,000. The appellate court ruled that $100,000 was the highest award reasonable on the record.
In the present case, plaintiffs symptoms are similar to those suffered in Brasseaux, supra, except that they are not permanent. As per the jury verdict, Ezzell’s symptoms are expected to be resolved during the next two years. Similarly, in Smith, supra, the headaches are deemed to be permanent, while here they are not. Considering the entire record before us, we deem that the lowest reasonable amount that the jury could have awarded for future pain and suffering is $75,000, and we therefore amend the judgment in Ezzell’s favor by this amount.
The final issue here concerns the medical bills. A tortfeasor is required to pay for the medical treatment of the victim, and even for overtreatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith. Lombas v. Southern Foods, Inc., 00-26 (La.App. 5 Cir. 5/30/00), 760 So.2d 1282, 1289-90. The victim’s burden is to show by a preponderance of the evidence that the expenses were incurred because of the injury. Id. at 1290. Here, the defendant does not contest the bills for Doctors Zorthian and Mohnot. He argues that Dr. Andrews only tested Ezzell and that this did not constitute treatment. We disagree. Dr. Mohnot referred him to Dr. Andrews for testing to determine more precisely his condition. Dr. Andrews in turn recommended that he undergo rehabilitation treatment at Touro Hospital. These services were clearly related to plaintiffs treatment, and are therefore recoverable.
As to whether Dr. Andrew’s bills should be included in the special damages, we note that it is not uncommon for treating physicians to refer patients to doctors in other specialties for examinations and consultations or reports. See: Akerman v. Dawes, 94-0757 (La.App. 4 Cir. 1/19/95), 658 So.2d 1270, 1275. This allows the treating physician the benefit of the other doctors’ specialized expertise. Put most directly, there is no indication in the record that any of the examinations was not medically necessary or advisable. Thus, the charges for the examinations for the “non-treating” physicians are recoverable. Id.
With regard to Dr. Thompson, he was asked to examine Ezzell to determine if there were any treatments that he might render to improve Ezzell’s mental state. Although Dr. Thompson did not render actual treatments, he did not do so because he felt that there was nothing that he could do. Again, this visit was for potential treatment, and is therefore com-pensable. Similarly, Mr. Meunier, a vocational rehabilitation expert, was asked to see Ezzell to determine whether he would profit from some form of rehabilitation. This expert, like Dr. Thompson, did not feel that Ezzell would profit from such an exercise, and so did not attempt to render further services. While rehabilitation is not precisely medical treatment, it is nonetheless treatment that could potentially restore a victim’s ability to return to work, and thus is an item for which a tortfeasor is liable. Ezzell clearly met his burden of showing that the above expenses were all related to the injury he received.
Appellant also argues that the hospitalization at Touro Hospital due to chest pains and shortness of breath was clearly unrelated to the incident. Ezzell testified that he has suffered from tremors *655 since the date of the incident although the tremors have calmed down tremendously. At one point, the tremors caused him to be hospitalized for four days. This was around October 2008 or 2009. Zorthian testified that on October 15, 2008, Ezzell was hospitalized at Touro Hospital. During a therapy session with her, Ezzell began shaking, having shortness of breath, and complaining of chest pain. Furthermore, in July 2008, Ezzell | ^complained of tremors to Dr. Mohnot. Although appellant focuses on the shortness of breath and chest pain symptoms, both Zorthian and Ezell stated that he was also shaking. The jury could have reasonably credited Ezzell’s account that he went to the hospital in order to receive treatment for tremors that had not been present before the accident.
Finally, appellant questions Dr. Rouchell’s treatment costs as unrelated to the accident because Ezzell had a preexisting bipolar disorder. Dr. Mohnot testified that in his opinion, Ezzell’s age and bipolar disorder, along with some other predictors like pre-existing psychological problems, definitely made it difficult to treat his symptoms and symptoms would last much longer than those experienced by a younger person with no previous medical history. Dr. Rouchell testified that he treated Ezzell for “sequella” from the incident. He explained that at the time of trial he recommended that Ezzell continue receiving psychotherapy — treatment the doctor had provided — for the stressors in his life related to the incident. According to Dr. Rouchell, the depression had been more persistent, harder to manage, and more difficult to treat due to the effects of the incident where Ezzell was struck by Miranne. Thus, the jury could have reasonably found that Dr. Rouchell’s treatment expenses were related to the injury Ezzell received.
Accordingly, with the exception of the general damage award for future pain and suffering, which we amend, we affirm the other awards.
Conclusion
For the foregoing reasons, plaintiff is awarded an additional $75,000 in damages for future pain and suffering. In all other respects, the judgment is affirmed.

AMENDED IN PART AND AFFIRMED AS AMENDED.