WICKER, J.
Lin this appeal, Semco, L.L.C. and The Grand Ltd. seek review of the trial judgment, rendered following a nearly three-week jury trial, awarding $4,831,144.00 in favor of Semco and $680,845.00 in favor of The Grand for damages arising out of the construction of a multi-million dollar lift-boat. For the following reasons, we affirm the trial court judgment but amend the judgment to award judicial interest from the date of demand.
PROCEDURAL HISTORY
On October 28, 2013, Semco filed suit against The Grand for claims arising out of the parties’ January 30, 2012 contract to construct a liftboat. In its petition, Semco, the builder, alleged that, in light of various changes requested by the owner, The Grand, in addition to design difficulties in reaching the desired tonnage for the vessel, the construction cost far exceeded the $15,934,000.00 contract price. Semco asserted claims for reformation or rescission of the contract and sought first the total construction cost, minus the amounts already paid by The Grand, or, alternatively, the cost of the specific changes that increased the contract price. Semco filed an amended petition, additionally asserting claims for detrimental reliance and unjust enrichment.[1]
The Grand filed an answer to Semco’s petition, asserting that the contract at issue is a fixed-price contract and, thus, with the exception of the approved change orders executed, Semco assumed the risk of any additional construction costs incurred. *1009 The Grand additionally filed a reconven-tional demand against Semco, alleging that the vessel was defective in several respects upon delivery and, further, that The Grand sustained monetary damages related to the delay of the completion and delivery of the vessel.[2]
l2On July 31, 2015, the Grand filed a motion for partial summary judgment as to several of Semco’s claims, including its causes of action alleged for total cost damages and for reformation and/or rescission of the contract.[3] After taking the matter under advisement, the trial judge denied The Grand’s motion.
The matter proceeded to trial by jury on September 8, 2015. During a jury charge conference, The Grand objected to the trial court’s denial of its proposed jury charge concerning the law pertinent to lump-sum or fixed-price contracts. At the conclusion of Semco’s case-in-chief, The Grand moved for a directed verdict on Semco’s contract rescission and reformation claims as well as its claims for unjust enrichment and detrimental reliance. The trial judge denied the motion for directed verdict without reasons. Following a nearly three-week trial, the jury returned a verdict in favor of Semco in the amount of $4,831,144.00, with legal interest from the date of judgment, and in favor of The Grand as to its recon-ventional demand in the amount of $680,845.00. Both parties have appealed, challenging the amounts awarded by the jury and raising other specific assignments of error addressed below.
FACTUAL BACKGROUND
This litigation arises out of the construction of a liftboat. A liftboat is a large vessel with retractable legs that imbed into the sea bottom and allow the vessel to be elevated—providing offshore working and living spaces for the onboard workers. Semco, formed by John Powers, is a marine engineering and construction company that developed a unique patented crane design, which allows the liftboat’s crane to be placed on a leg of the vessel, rather than on the deck, thereby providing more valuable open deck or work space on the vessel. The Grand is a ^holding company formed by Bob Springob for vessels and equipment operated by a group of other companies started by Springob, namely Laredo Construction, Laredo Offshore, and Springob Enterprises.
On January 30, 2012, Semco and The Grand entered into a contract for the construction of a liftboat, the Brazos.

The Contract

The January 30, 2012 written contract at issue between Semco and The Grand provides that Semco would construct a vessel for The Grand in accordance with the at--tached Contract Specifications and Drawings, for the , contract price of $15,934,000.00. Attached to the contract are extensive specifications which provided for the construction - of a 230-foot leg length jack-up barge with a 200-ton leg crane capacity and a 120-foot boom length. The parties revised the Contract Specifica *1010 tions in May 2012. and June 2012. The written amendments to the contract relevant to this appeal are (1) the original Contract Specifications provided that the vessel, including the hull and structural bulkheads, would be of steel construction; the June 2012 revised Contract Specifications provided that the structural bulkheads in the interior spaces would be of aluminum construction; and (2) the original Contract Specifications provided that Semco would obtain ABS/ANSI certification and the June 2012 amendment reflects that the “API 2C, 7th Edition only” is required.
The Contract Specifications further provided that the vessel would be under 200 US regulatory gross tons. However, the contract contained a provision which stated that if Semco could not achieve a tonnage under 200 gross tons through normal methods, the parties would negotiate a solution, which may result in increased construction costs.[4] The language in the' contract provided;
• I ¿Builder shall make all practical efforts to obtain US regulatory tonnage of less than 200 gross tons. If not practical or possible by normal methods, a satisfactory solution shall be negotiated between the builder and the owner which may include additional cost.
The contract further contained a warranty 'clause, indicating that the vessel would be delivered in accordance with the contract specifications and drawings and free from defects. The contract required The Grand to give prompt notice to Semco of any alleged defects upon discovery but in no event would Semco be responsible for any alleged defect not reported within 180 days from delivery of the vessel. In the event Semco was timely’notified of any defect, the contract instructs that Semco would be responsible to correct the defect or to allow The Grand to correct the defect, subject to a specified reimbursement claim. The contract contained a “Waiver of Consequential Damages” provision, stating that both parties waived any indirect, incidental, , or consequential damages arising out of the contract, .,
Concerning the paint application for the vessel, the contract provided that Semco would use Carboline paint and apply the same in accordance with- the manufacturer’s 'Specifications and instructions. The warranty provision, howéver, specifically excluded any warranty for defects related to the manufacture of the paint itself or the manufacturer’s recommendations for application.
The contract provided that, only Sprin-gob and Powers, as the designated representatives for The Grand and Semco respectively, could modify or change the contract terms.[5] The contract provided that the written contract superseded any prior oral agreements or understandings and that, any , changes to the Contract Specifications must be requested in the form of a change order and approved in writing. The contract provibed that, if The Grand failed to respond to- a requested I ^change order, the change order would be deemed rejected and the changed work would not be performed.
The contract stated that each party materially contributed to -the terms of the *1011 contract and that the contract should be considered mutually drafted.

Factual Testimony and Evidence Presented at Trial

At trial, both parties presented testimony and evidence surrounding the January 30, 2012 written contract as well as the relationship and discussions between the parties prior to and during the Brazos’ construction. To support its claim's to recover the amount of the increased construction costs, Semco presented evidence concerning the disputed changes to the contract, or extra work performed, namely (1) the costs for work performed to achieve the desired tonnage of the vessel; (2) the costs associated with the change in the deckhouse construction from steel to aluminum material;' (3) the increased costs for the installation of larger generators than those provided in the original contract; and (4) the additional costs associated with increasing the crane’s lift capacity.[6] The Grand presented evidence to support its claims for damages related to Semco’s allegedly defective work, including defective paint application, as well as to prove it was entitled to credit for work Semco allegedly failed to perform as required under the contract.
Powers testified at trial that he formed Semco in the 1990s after working with his family business, Powers Offshore Services, since 1981. At the time of the contract at issue, he considered Semco to be a global leader in the liftboat industry.[7] Powers described the characteristics of a liftboat and testified that the most important utility aspects of a liftboat are. the crane, the deck space, the living quarters for the workers, and the platforms or workspace for workers.
InPowers testified that he and Springob have been friends and business associates since the 1980s; In 2011, Springob located a foreign buyer for a liftboat that Semco built, and the two shared the profits from that sale. Shortly thereafter, Springob approached Powers about building a liftboat for The Grand’s fleet. Powers testified that Springob wanted a liftboat for The Grand under 200 US gross tons, to avoid the requirement for a licensed engineer on board the vessel. Powers testified that he made it clear to Springob that Semco had never built a liftboat under 200 gross tons. He told Springob “if it was only issues of applying tonnage openings in the quarters, we [Semco] felt we could do that.” However, he informed Springob he was not completely “comfortable” with estimating the construction costs without consultation with a tonnage expert. Semco retained a tonnage expert to consult regarding calculating tonnage for the Brazos project prior to execution of the contract.[8]
According to Powers, Semco noticed an increase in man-hours and overall design and construction costs for the Brazos project in November or December 2012, and scheduled a meeting with Springob. At that January 2013 meeting, according to Powers, he informed Springob and Nadja Knoulton, the Vice-President of The Grand and Springob’s daughter, of the increased costs he believed were primarily *1012 related to the tonnage design and changes requested by The Grand. Powers testified that Springob repeatedly instructed him at that meeting to “Keep building the boat. Do not cut corners.” He testified that Springob assured him that The Grand “would not hurt” him or Semco.
Powers discussed an April 16, 2013 email from Allen Moore, Semco’s engineer, to Springob discussing the increased construction costs.[9] The email discussed the major contested issues on the project related to the increased | construction costs—the extra work performed to reach the desired tonnage under 200 gross tons; an increased crane load capacity; the increased size of the generators; and the aluminum construction deckhouse.[10]
Powers testified that, following that email, he met with Springob again to discuss various options concerning the increased construction costs. At that second meeting, he and Springob discussed “outside the box” ideas to handle the cost increases, such as selling the boat to Nigerians that Springob had prior business dealings with and splitting the profit. Powers further testified that he offered at that point to return to The Grand all monies it had paid on the project. Powers testified that at some point he offered to buy the Brazos back from The Grand for $28 million dollars, which The Grand refused. Powers indicated that The Grand did indicate that it would accept a $50 million dollar offer for the Brazos.[11] According to Powers, Springob again encouraged him to “keep building the boat” and not to cut any corners during construction.
Powers testified that to some extent, Semco and The Grand “got away from the change order program” during construction and The Grand failed to respond or provided delayed responses to multiple change orders.[12] He testified that change *1013 |sorders and other informal requests were approved by .email and/or verbally by Springob as well as other Grand employees.[13]
Following the April 2013 email and discussions, Powers offered for Springob and other Grand representatives to come to Semco and inspect its financial records related to the Brazos project to justify the increased costs. In July 2013, Springob and Knoulton went to Semco’s offices and reviewed some financial documentation and, according to Powers, the three again sat down for a meeting to discuss the construction cost increase. Semco subsequently retained two experts, Bill Coney-bear and his colleague Al Nierenberg, to review Semco’s financial records related to the Brazos'project to determine the exact cause of the cost increase. Semco also retained Norman Dufour, Jr. with Dufour, Laskay & Strouse, Inc., to perform an appraisal of the Brazos. Powers sent correspondence to Springob in August 2013, informing him that Semco retained experts to review its books and to appraise the value of the Brazos.
Powers discussed his business relationship with Springob and All Coast, a separate company run by Powers and his colleague John Nesser. Powers and Nesser, during the construction of the Brazos, approached Springob about merging All Coast with Springob’s fleet of vessels owned by his company, Laredo Offshore. Powers testified that All Coast together with Springob submitted a bid on: a Derrick barge vessel to incorporate into All Coast. Although that bid was rejected, Powers testified that he continued to discuss the possibility of Springob’s involvement in All Coast. He stated they discussed the possibility of purchasing an even larger fleet, the Hercules Fleet, to merge with the All Coast and Laredo | gfleets.[14] However, Powers testified that this deal never occurred because Springob did not want to merge his fleet with All Coast. Powers testified that the deal would not be beneficial to All Coast, as one of Laredo’s competitors, without merging the Laredo fleet.[15]
For this proposed business venture, however, both Semco and the Laredo companies had to submit financial documentation to Whitney Bank to obtain financing for the Derrick barge bid. Powers testified that Springob submitted his financial documentation to Nesser, who then forwarded it to Whitney Bank, and that he personally never viewed Laredo or Springob’s financial documentation.
Springob testified at trial that he owns four companies—Laredo Construction, *1014 Laredo Offshore Services, Springob Enterprises (which owns and maintains a shipyard in Galveston, Texas), and Thé Grand. He testified that he has known Powers for more than 25 years and has successfully done business with him in the past. -Sprin-gob testified that Semco was the only shipbuilder at the time of the contract that could build a 225-foot leg length liftboat and was further the only company that could build a liftboat With its patented leg crane design, Springob testified that he was aware that Semco had never built a vessel under 200 gross tons and recognized that he knew, at the time the contract was executed, that there could be additional costs associated with achieving that tonnage. Springob then testified to his opinion that, because Semco retained a tonnage expert pre-contract, any additional costs associated with achieving the desired tonnage were costs related ■ to the vessel’s design and were Semco’s responsibility, under the contract.
Springob's testimony concerning the time at which Powers informed him of the cost increases differs from Powers’ testimony. Springob denied that Powers | ^informed him in January 2013 of the increased construction costs. Rather, Springob testified that he first learned of the increased costs in April 2013. He stated initially that he told Powers that Semco alone would be responsible for the increased costs, but admitted that, in that same April 2013 meeting, he instructed Powers to keep building the boat—he further admitted to telling Powers that he would work with him and “help” him deal with the cost increase. Springob explained that he did riot intend to incur any additional costs to “help” Semco. Rather, he meant that he would pay outstanding payments under the contract and pay for the approved change orders, to provide Semco with additional cash flow to continue building the boat. He further acknowledged that he and Powers discussed “several schemes” to handle the cost increases.
Springob acknowledged that he and Knoulton reviewed Semco’s books at the Semco yard in July 2013 and that he had several meetings specifically concerning increased construction costs. Further, Sprin-gob testified that Rory Hebert, a Grand employee, was at Semco’s yard “weekly, sometimes daily, and we felt secure” about the construction.
Springob testified concerning changes to the contract and admitted that other Grand employees approved change orders and may have had authority to communicate approvals to Semco employees.[16] Springob testified that, in January 2013, he- received an email with an attached “Master Change Order List” from Semco and that no change order related to increased costs associated with achieving the desired tonnage, the aluminum construction of the deckhouse, or the vessel’s crane lift capacity.[17] He further testified that as late as April 2013, he had In not received any invoice for any changes to the. contract—including change orders approved in writing.[18]
*1015 As to the Brazos’ increased crane lifting capacity, which became available with the Coast Guard’s release of its 7th edition load charts after the January 30, 2012 contract date, Springob acknowledged that the change was desirable to The-.Grand because the greater the lifting capacity, the more attractive or useful the boat is for clients. He testified that he received correspondence from Semco concerning the Coast Guard’s 7th edition load charts and. that The Grand instructed Semco to use the revised load charts to increase the crane’s lift capacity. However, he testified that Semco never informed him that the revision would cost The Grand any additional money.[19]
Concerning the construction of the deck-house, Springob testified that he contemplated that the deckhouse of the Brazos would be aluminum construction, not steel, and that the omission of this detail in the contract was an oversight. He testified that he discussed with Powers and other Semco employees pre-contract that' The Grand wanted the Brazos’ deckhouse to be aluminum construction. Springob further challenged a disputed written ■ change • order related to increasing the number of planetaries on the vessel from six to eight per leg, indicating that the contract’provided for a minimum of six planetaries per leg and, thus, Semco should be responsible for the additional planetaries as part of the design of the vessel.[20]
|iaOn September 11, 2013, Springob received an email from Powers with an appraisal attached, performed by Dufour, valuing the Brazos at $28.5 million. Springob testified to his theory that. Powers obtained an appraisal of the Brazos with such a high valuation as • a “scheme” to get Springob to walk away from the Brazos so that Powers could sell the vessel to All Coast.[21] Springob testified that he had *1016 worked with Dufour in the past, and decided to contact him by telephone to discuss Dufour’s valuation of the Brazos. Springob expressed concern to Dufour that he did not want the vessel valued at $28.5 million because The Grand would then have to insure the vessel at a much higher value than the original contract price. He asked Dufour to draft correspondence, to utilize for insurance purposes, appraising the Brazos at a much lower figure and did not disclose to Dufour that any dispute concerning construction costs existed between Semco and The Grand.
On October 13, 2013, Dufour drafted correspondence to Springob, as he requested, indicating an “error” in his initial appraisal of the Brazos and stating an accurate valuation of the Brazos to be $18 million. Subsequently, on October 30, 2013, Dufour drafted a second letter to Sprin-gob, stating that he recently became aware of the dispute between The Grand and Semco. Dufour’s correspondence stated that, “[g]iven the circumstances, I would request that you not use my letter for any purpose as it was based on apparently incomplete information." At trial, Semco introduced into evidence The Grand’s insurance policy for the Brazos, which insures the vessel for an increased amount of $21 million.
11sSpringob testified generally that the Brazos contained numerous defects upon delivery, requiring The Grand employees to spend approximately 30 days preparing the Brazos for offshore utilization.
Tarn Springob, Bob Springob’s son and President of Laredo Construction, testified that he has a law degree as well as a degree in civil engineering. He testified that as an attorney he occasionally engages in private practice and reviews all contracts for his father’s companies. In 2011, he and his family began discussions of building a new vessel and they obtained estimates from various shipyards. He testified that they ultimately selected Semco because of its reputation and the quality of its vessels. He testified that he reviewed the January 30, 2012 contract at issue from both a civil engineer and legal perspective and further forwarded the contract to outside counsel for review as well. Tarn testified that The Grand’s fleet is used by the Laredo companies to perform offshore work.
Concerning the steel versus aluminum construction, he testified that all of Laredo’s vessels have deckhouses and pilothouses with aluminum construction. He testified that aluminum construction is important because it is much lighter than steel and, thus, allows a vessel to have more equipment and cargo weight on-board. He stated that the parties agreed pre-contract that the hull and the deck would be of steel construction but the pilothouse and deckhouse would be aluminum. Tarn further testified that Semco was well aware that The Grand wanted a vessel under 200 gross tons to avoid having to pay an engineer to remain on the vessel and, further, to decrease the overall cost of manning the vessel—boat captains are paid according to the tonnage that they are certified to operate.
Tarn testified that he first learned of the cost increases in April 2013 and that he *1017 was “shocked.” Tarn acknowledged that Powers at one point offered to buy the Brazos back from The Grand and return all monies it had invested into the Brazos construction. He further acknowledged that neither he nor Springob told Powers to lustop construction on the Brazos, but rather told him “we will do what we can.” He stated that, because he considered Powers to be a friend to his father, he would do what he could to help him out— but it was his understanding that Semco'as the designer and builder was ultimately responsible for any cost overruns.
After Tarn received an email from Sem-co indicating that the cost of the vessel had reached approximately $28 million, he forwarded that email to outside counsel and asked if he should “burst that $28 million bubble right now?,” to which outside counsel responded affirmatively. Thereafter, Tarn emailed the bank officer handling The Grand’s construction loan and asked him to set up a new survey for the Brazos. The bank officer responded that he would schedule a survey but mentioned that if the survey came out at a higher value than Semco’s survey, it may not be in the bank or The Grand’s best interest to do so. Soon thereafter, in October 2013, Tarn accompanied Rory Hebert and two naval architects to review Semco’s documents at the Semco yard, including “boxes and boxes of time cards” and man-hour time sheets as well as material and equipment invoices, to calculate the alleged construction costs. Tarn reviewed documents for two and a half days and further retained an expert, David Bourg, to review the documents for three days. Following the review of Semco’s construction records reflecting the costs associated with the Brazos project, Tarn emailed the bank officer again and stated “Our current inclination may be to hold off on the surveyL]”
Nadja Knoulton, Springob’s daughter and The Grand’s Vice-President[22], testified that Powers and her father had a professional relationship for approximately 35 years.[23] Concerning the contract at issue, Knoulton testified that the contract went through a few drafts and revisions prior to its execution. She testified that The Grand retained outside counsel to review the contract and that her | ^brother, Tarn, also reviewed the contract prior to executing it. Nevertheless, Knoulton indicated that Semco “snuck in” the tonnage provision but acknowledged that The Grand never objected to the additional language.
Concerning the construction cost increase, Knoulton acknowledged that Powers informed her and Springob by April 2013 of the alleged overruns. She testified that she felt sorry for Powers because it seemed as if the project had gotten away from him. She admitted that she and her father told Powers to keep building the boat and that they would help “look into” the increased construction costs and reach a resolution. Knoulton affirmed her father’s suspicions concerning Powers’- alleged scheme to gain control of the Brazos for the All Coast fleet.[24]
*1018 Concerning changes to the Brazos' design, Knoulton testified that the crane’s lift capacity is the most important factor to The Grand for marketing liftboats to their clients. She testified that, when the new load charts came out indicating that the crane’s lift capacity could be increased, that was certainly beneficial to The Grand. She alleged, however, , that The Grand was never informed that there would be any additional cost associated with the increased capacity. ,
Christian Pierce, Semco’s only naval architect, testified that Semco has built the largest liftboats in the Gulf of Mexico, and that the Brazos was the smallest vessel Semco has built. Pierce reiterated that Semco had never built any vessel under 200 gross tons. At the early stages of the vessel’s design, he consulted with.a former colleague stating that for the first time in his career he was playing the “tonnage game.” Pierce stated that, pre-contract, Semco retained a tonnage expert to assist in designing the vessel to meet the desired tonnage under 200 gross tons; |16however, he testified that, without a written contract, it was difficult to justify spending substantial money on an expert. In February 2013, Pierce' stated the tonnage expert informed him that the framing for the vessel needed to be changed from 5-foot spacing throughout, as provided in the original specifications, to 4-foot spacing throughout to meet the tonnage requirement, Pierce testified this change required Semco to essentially reconstruct the interi- or of the vessel, which also added to the weight of the vessel,[25]
He further stated that the vessel’s design upon its inception was a simple one but that it evolved during construction. Pierce testified that the.Brazos’ design in early discussions started out as a 200-foot leg length, which became a 225-foot leg length as provided in the original contract, and then increased eventually to a 230-foot leg length. Pierce explained how a change in a liftboat’s leg length affects the overall design and structure of a liftboat, stating, “the.interaction between hull.size and legs size are very dependent on one another... I need a bigger boat to hold up longer legs. When the boat is jacked up I need stronger legs to hold up a bigger boat and vice versa.” Further, Pierce stated that there were significant changes to the crane’s lifting capacity, which is the amount of weight the crane can lift at a certain radius—the initial specifications provided for a lifting capacity of 200 tons at a 35-40 foot radius and the Brazos’ lifting capacity upon delivery was 200 tons at a 65 foot radius. Pierce testified that the structure of the leg did not change as a result of this increased lifting capacity, but the design of the jack tower did change which increasecl the weight 'of- the jack tower. The jack tower on the Brazos is the heaviest jack tower Semco has ever used on a vessel. Pierce reiterated that Semco’s *1019 estimate of construction costs is generally-based upon the weight of the vessel.
• |17Allen Moore, Semco’s general manager, testified that he is an engineer who has worked with Powers continuously since 1981. Moore testified that the preliminary discussions for the Brazos build began with‘a relatively simple design—he referenced an email to Shankar Mody, a structural engineer, in which he asked Mody for an estimated price for the build and stated that the boat is planned to be a very “plain” liftboat without any extras. Moore stated, however, that the liftboat delivered to The Grand was anything but plain.
Moore drafted the contract’s tonnage provision after discussion with Powers about the vessel’s design. He testified that, because Semco had never built a vessel under 200 gross tons, he thought the language would be beneficial to protect Sem-co should it not be able to achieve the desired tonnage within the contract drawings and specifications. To his knowledge, no one at The Grand objected to the addition of the tonnage provision. Moore testified that, in the beginning stages of the design, Semco was under the impression that it could simply exempt much of the vessel’s space below the deck from the tonnage calculation to achieve the desired tonnage. Moore stated this method to exempt certain areas from tonnage calculations was the “normal methods” he anticipated under the contract. However, he stated that as the experts became more involved and the tonnage was continuously calculated, Semco was told that it could not exempt those areas with the five-foot framing it designed.
Moore testified that he oversaw the Brazos project until Steve Juul, a Semco employee and Powers’ son-in-law, took over as project manager. Moore testified that in the beginning of the project, he would submit change orders and requests to The Grand and would not receive a timely response until ■ an in-person meeting with Mike Babin or Rory Hebert, Grand employees, who would relay Springob’s approvals; i
| ^Concerning the aluminum versus steel construction, Moore testified that Semco and The Grand went- back and forth on that selection—he stated that pre-contract they discussed several options; all aluminum, all steel, or one deck aluminum and a separate steel deck. He admitted that in January 2012, immediately before the execution of the contract, he sent an email to Mody regarding weight calculations which stated that The Grand wanted aluminum construction for the deckhouse. Moore testified that he referenced The Grand’s preference for aluminum construction for the deckhouse to Mody because Semco typically does steel construction and he wanted to bring to Mody’s attention that the boat may be different from- what he quoted for Semco in the past; Concerning the- larger generators installed, Moore testified that Semco initially informed The Grand that larger generators would likely be needed, but The Grand still requested that the smaller generators be included in -the initial specifications. However, after further calculations and inspections, Semco’s experts determined that the larger generators were needed to support the Brazos. Moore testified'that The Grand had knowledge of the larger generators being installed and never objected.
Concerning the crane’s increased lift capacity, Moore testified that he first learned of the newest edition of the API guidelines in May 2012, which raised the crane’s load lifting capácity and' allowed the Brazos’ crane to reach out and lift at a farther radius, He further testified'that the increased costs related to the increased lift capacity were not the result of changes to the crane itself. Rather, the increased *1020 costs arose because “the supporting structure for the crane had to be increased in order to handle the higher loads that the crane was putting into the boat.” Moore testified that this increased lifting capacity was “a big deal in the boat world.” Moore acknowledged that he did not inform Springob of the exact cost increase for the increased crane lifting capacity. However, he maintained that Springob had asked several times throughout the contract if there was a possible way to increase | rathe crane’s lift capacity and that there is no way that Springob, as an experienced vessel and shipyard owner, did not know and understand that the supporting structure would need to be modified and that there would be additional costs associated with an increased crane lift capacity.
. Moore testified that Semco noticed an overall cost increase to the project in late 2012, and that he, thereafter, contacted Dufour to perform the survey of the Brazos. He testified that Dufour boarded and inspected the vessel by himself. He stated that Dufour did not review the contract itself but did review the specifications. Moore testified that Dufour did not ask, and Moore did not disclose, the contract price nor the overall construction costs to date.[26]
Steve Juul, Powers’ son-in-law and project coordinator for Semco, testified that he became involved in the Brazos project in the summer of 2012. He stated that he coordinated with Moore, who provided him with a Master Change Order list of all requested changes to date. However, according to Moore, The Grand failed to respond to many of the change orders and many of the approvals were verbal or in person during meetings. Juul testified that, when he took over the project, it appeared as if “that’s the kind of company we were dealing with at that point, a company where we could talk. We knew the owners were friends. They could just communicate. We assumed at that point that’s how the project was going to go.” Juul acknowledged that there are no written change order requests concerning aluminum versus steel construction, increased crane lifting, capacity, or design changes related to the. desired tonnage under 200 gross tons. He further stated .that, he did not submit weekly progress reports to The Grand because he was informed at some point by Mike Babin, a Laredo employee, that The Grand did not 12nneed them weekly but rather only required reports when they needed an additional draw of funds from the bank for the construction.
Concerning the change from steel to aluminum deckhouse construction, Juul testified—consistent with Moore’s testimony—that the parties had repeatedly discussed the possibility of and desire to have aluminum construction but had discussed all options, from an all-steel construction, an all-aluminum construction, or one deck aluminum and one deck steel construction. He maintained, however, that in the summer of 2012, when the Contract Specifications were changed to add aluminum construction for the deckhouse, it was a “very obvious” change for both parties.
Michael Babin, former Vice-President of Administration for Laredo Offshore Services, testified at trial that he was involved in the Brazos construction project while employed by Laredo. He testified that all decisions for the Brazos project went through Springob. Babin testified that he and Hebert regularly inspected the Brazos at the Semco yard during construction. Babin recalled a visit to the Semco yard *1021 during which he and Hebert observed the Semco employees prepping the vessel to be painted. He testified that he informed Semco that the paint prep work was unacceptable for proper application. Babin testified that he found Powers and Semco employees to be “top notch professionals” in addressing any issues that arose during the Brazos construction.[27]
Concerning The Grand’s claim that Sem- • co delayed the construction of the Brazos, Babin testified that Laredo delayed construction in several respects. First, Babin referenced an email he wrote to Moore and Pierce with Semco on February 29, 2012, approximately one month after execution of the contract, stating, “Rory [Hebert] and I finally completed our most recent projects. Apologies for the | ⅞1 absence of communication. We now have time to dedicate to our new build [the Brazos].”[28]
Babin testified that his departure from the Laredo companies after four years was a mutual one. He testified that Knoulton misrepresented the truth often and that he could not continue to work with her. Babin testified that, prior to his departure, he lent the Springob family tens of thousands of dollars in commercial barbeque equip-merit for the family’s use in a highly attended barbeque competition in Texas. He testified that, despite numerous requests, Knoulton never returned the commercial equipment to him. The Grand did not cross-examine Babin nor call him in its case-in-chief.
John Nesser, Powers’ business partner and attorney for All Coast, testified that he was not involved in the drafting or execution of the contract for the Brazos. He testified however that, at some point in time, Powers complained to him that the construction costs for the Brazos vessel had significantly increased and that Powers intended to meet with Springob to discuss the cost overruns. Following a meeting with Springob, Powers discussed with Nesser the drafting of an amendment to the Brazos contract. Nesser testified that Powers returned from his meeting with Springob and indicated that the two had reached an agreement concerning the construction cost increase. Nesser drafted a document, titled “First Amendment to Construction Contract and Change Order Approval,” which Nesser testified memorialized the agreement Powers conveyed was reached with Springob.[29] Nesser testified *1022 that Springob never signed the amended contract.[30]
laaNesser testified that, on occasion, the Brazos project would come up during his meetings with Powers and Springob concerning the All Coast deal, although they generally kept the projects separate. Nesr ser testified, however, that Knoulton commonly told Powers not to worry about the cost overruns and to “just keep building the boat, and often Bob [Springob] would chime in don’t cut any corners.... [W]e don’t want to hurt you, we are going to work with you, just keep building the boat. I heard it several times.”
Rory Hebert, manager of maintenance and repairs for Laredo Offshore, testified that he was involved in the Brazos construction project and regularly visited the Brazos to ensure that construction was progressing. At trial, he testified concerning The Grand’s claims against Semco. Hebert discussed a detailed spreadsheet prepared by The Grand that itemizes both the cost of work The Grand allegedly performed on the boat after delivery and the estimated cost of the work it claims must still be performed. The spreadsheet also contains itemized credits to which The Grand contends it is entitled under the contract for items or equipment not provided.[31] The spreadsheet, introduced into evidence at trial, lists the estimated amount of The Grand’s claims against Semco to be $1,889,812.24.
Hebert discussed several, but not all, of the items provided in The Grand’s spreadsheet. For example, concerning credits The Grand seeks under the contract, Hebert testified that Semco installed solid plate flooring in the engine room, instead of the checkered plate flooring to prevent sliding, which was provided for in the contract. The estimated cost to replace that flooring with checkered plated 123flooring is listed as $47,184.75.[32] He further testified that the contract provided for an additional control station in the engine room to jack the boat remotely from the control room and that Semco did not provide that on the Brazos. The estimated cost for the additional control station is $60,000.00. He further explained that Semco placed additional, unnecessary drains at the forward, aft, and midship of the vessel, where the contract specifically provided for “0” drains to be placed midship. The estimate to remove the drains not provided for under the contract is $10,620.00.
Hebert further testified The Grand retained JC Marine Contractors to install a *1023 new weather station because the one installed was not working properly and, according to Hebert, Moore with Semco informed him to install a new one. The cost to install the new weather station was $3,432.00. He also asserted that Semco failed to install interior water heater drip pans or check valves in the event of a leak, which is an estimated cost of $6,675.00, or install a rigged walkway in the breezeway, as provided in the contract, which is an estimated cost of $422.84. Hebert testified that The Grand should be credited $44,806.67 for the piping for a watermaker, initially provided for in the contract, which Laredo employees installed after delivery. Hebert testified that Semco failed to install clean outs for drains, shelving, and include other miscellaneous items as provided in the contract.
The spreadsheet estimates The Grand’s cost for its employees’ labor to perform certain work to be $86,432.05 at a labor rate of $65.00 per hour but does not break down the number of labor hours required per line item or work performed.[33]
^Hebert testified that he observed improper paint preparation and further observed improper paint application of certain parts of the vessel. Hebert testified that, shortly after delivery, the Brazos had rust bleeding through on the deck, requiring The Grand’s crew to sand down and repaint the entire, deck. He .testified that The Grand has repainted sections of the boat, only repainting' small sections at a time—so that the boat would not have to be “out” of commission for three months for repainting.
Hebert also testified concerning issues with the generators, indicating that, at some point during construction, he recalled that water got into the generators in the Semco yard and that a manufacturer’s representative came to the yard to repair or rebuild them. Hebert testified that, at some point in time, he was not allowed in the Semco yard. Concerning The Grand’s claim that Semco delayed delivery of the Brazos, Hebert testified that he observed the Barracuda, another vessel, in the Sem-co yard undergoing renovation between September 2013 and December 2013 and that Semco delayed delivery.[34]
*1024 Glenn Rodrigue, the Brazos’ boat captain, testified that he has been a Laredo captain since 2005 and was not hired in anticipation of the Brazos construction. Rodrigue testified concerning The Grand’s claim against Semco for defective paint application. Rodrigue testified that he visited the Semco yard at some point and saw Semco employees using a floor buffer to prep the deck for paint application, which he had never seen before. Further, during one visit to the Semco yard, as the Semco employees pressure-washed the boat, Ro-drigue observed paint chipping off |Mof the Brazos. After the Brazos was delivered, Rodrigue testified that he and his crew had to repaint portions of the Brazos, including the entire top deck, because the paint had chipped off. He further stated that paint had chipped off in the tank area and the metal was beginning to rust.[35]
Rodrigue further testified that the Brazos’ clutch became stuck in gear during sea trials. He recalled two additional incidents concerning the clutch while the boat was in Galveston, Texas, but stated that he and a seamate were able to fix the clutch issues quickly. However, Rodrigue testified that one night in August 2014, he attempted to slow the Brazos as it neared a tugboat and the clutch remained in gear, causing the Brazos to strike a tugboat. Rodrigue testified to his opinion that the cause of the collision was the clutch remaining in gear.
Rodrigue testified that due to previous issues with the clutch and the actuator—a device or rod that takes commands from the captain and moves the clutch forward, in reverse, or in neutral—The Grand retained an outside company to replace the actuator twice prior to the August 2014 collision. Rodrigue was uncertain if Laredo or The Grand notified Semco concerning the actuator issue prior to contacting an outside company to repair and replace the actuator.

Expert Testimony

Semco retained Tim Anselmi, a marine surveyor, to estimate the value of the Brazos as of September 2013. Mr. Alselmi explained the two processes for valuation: the cost approach and the sales comparison approach. Mr. Anselmi discussed the sales comparison approach and discussed the differences between the Brazos vessel and other 230 class liftboats. He testified that the Brazos is 38.75% larger than a typical 230 class liftboat. He explained that the Brazos’ pads, or feet that attach to the sea bottom, are 65% larger than a typical 230 class liftboat and the square footage of the usable deck space on the Brazos is 22% larger. He |Mfurther explained that the Brazos’ fuel capacity is larger than a typical 230 class liftboat, stating that its larger fuel capacity significantly increases the Brazos’ marketability as it allows the boat to stay offshore for a longer period of time and, thus, to make more money.
He testified that he has valuated hundreds of liftboats but that his research did not reveal a vessel similar enough to reach an accurate valuation of the Brazos using the sales comparison approach. He testified that his research reflected that a similar liftboat “just wasn’t there” and that he could not find any other vessel “as marketable” as the Brazos. Using the cost approach, which he testified has been accepted throughout the state through the American Society of Appraising and is a method he has used for sixteen years as a marine surveyor, Mr. Anselmi valued the Brazos at $30,900,000.00. He testified that he was unaware of the contract price or the actual construction costs at the time *1025 he valuated the Brazos. Further, his valuation included a 20% profit or markup amount, to represent the fair market value of the vessel.
Bill Coneybear, accepted as an expert in naval architecture, marine engineering, shipyard management, and project management, testified that Semco retained him to analyze construction cost for the Brazos. He testified that only a couple of dozen liftboats, over 200 foot, have been built in the United States and that Semco’s small yard, in Lafitte, Louisiana, has built more than half of those.[36]
Coneybear testified that Semco retained him to review the project to determine if any of the changes or overages were recoverable from the owner, The Grand. Co-neybear testified that he' reviewed the contract documents and project documentation to determine what changes were made from the contract and which of those costs were recoverable from the owner. He discussed disruptive changes |27⅛ the construction of a vessel, stating that any change typically increases costs and that the disruption caused by the change typically costs more than the actual change itself. He estimated that the overall increased cost related to changes to the vessel (including tonnage design, crane load modifications, larger legs, towers, and pads, the increased generator size, and the change from a steel to aluminum deckhouse) totaled $6,577,474.00.[37] Coneybear estimated that Semco’s total cost to build the Brazos was $30,529,154.00.
Semco also retained Allen Nierenberg, an expert in marine engineering and naval architecture, to determine and to calculate the additional costs incurred during the construction of the Brazos. He testified that in his expert opinion, Semco incurred $6,500,000.00 in additional costs above the contract price, with $2,600,000.00 of those costs associated with achieving tonnage under 200 gross tons. Nierenberg explained that tonnage is not a vessel’s weight; rather, it is a volumetric calculation of cargo carrying potential. He further testified that Semco’s estimated labor hours for the construction of the .Brazos were reasonable.
David Bourg, a liftboat design consultant, testified to his opinion concerning the Brazos design and the parties’ contractual negotiations. Mr. Bourg was accepted as an expert in naval architecture, marine engineering, including liftboat design, tonnage design, crané foundation design, leg tower and pad design, gear selection, weight estimating, shipyard support, production design, and change orders. Bourg testified that the concept of tonnage is centuries old and that the United States Coast Guard has a technical note, the NTN 01-99, published in 1999, that discusses the standard Coast Guard policies to calculate and determine gross tonnage. Bourg testified to his opinion that achieving tonnage under 200 gross tons for the Brazos project was practical and possible. He testified that four-foot spacing and a transversal framing system would be proper to achieve the desired | ^tonnage for the Brazos, but acknowledged that a vessel can have a five-foot spacing or framing *1026 design, as provided in the original contract specifications, and still achieve tonnage under 200 gross tons. He stated that, generally, when the shipbuilder is responsible for the new ship, design, that design is calculated and drawn far in advance of the contract or initial construction date.[38] ■■ •
Bourg testified 'that he noticed several issues with the Brazos design. He testified that Semco’s structural engineer overestimated the weight of the vessel by 1.1 million pounds, which resulted in Semco purchasing $2.1 million in extra steel unnecessary for the project.[39] Semco’s expert, Coneybear, disagreed and testified that his calculations reflected a 30% scrap •percentage, which he said is reasonable given the size of the Brazos.
Concerning change orders, Bourg testified that it is common in the industry for a shipbuilder to calculate and notify the owner of the cost increase for each requested change prior to performing the changed work. Regarding the modification to the crane lifting capacity, Bourg testified that he would expect Semco to inform' The Grand of the increased expense connected with the increased crane lifting capacity. He further , testified that the change, to the crane load chart also relieved Semco, essentially, of acquiring an American Bureau of Shipping (“ABS”) certification. He stated that this certification typically costs a builder up to $200,000,00 and that Semco did not acquire this certification as provided in the contract. Bourg stated that The Grand could have obtained the ABS certification after completion but has not done so. He further testified that the increased load lift capacity benefitted. The Grand.[40]
| saBourg testified to his opinion that Semco “could have gotten by with six” planetaries as provided in the contract and did not necessarily need the additional planetaries installed. On cross-examination, Bourg admitted that he did not conduct any calculations to arrivé at his opinion regarding the required number of planetaries for the Brazos.
Concerning the January 30, 2012 contract, Bourg testified that he has never seen any form of tonnage provision on any contract he has ever reviewed. On cross-examination, Bourg admitted that tonnage calculation is a specialty and that even he—a published professor in naval architecture and an expert in tonnage design with a Ph.D. in engineering and applied science—will on occasion still consult with an outside tonnage expert for a project,
John Mulvihill testified that The Grand retained him to calculate- the estimated cost associated with the Brazos delivery delay from May 7, 2013 (the original contract delivery date) to January 31, 2014 (the date the permanent certification of inspection was issued).[41] Mulvihill acknowledged that he is not qualified to state who is responsible for each delay but is qualified to calculate the cost--of delays in construction, Mulvihill testified that a vessel’s utilization is the number of days a year it is chartered and out making -money. He testified that Gulf Coast >;vessels are typi *1027 cally not used every day of each year—this is the utilization factor. Because the Brazos is a new vessel, he did not have prior records to reach an exact utilization rate for the Brazos. However, he compared similar vessels and reached a utilization rate of 75%-80%, meaning he opined that the Brazos would be. chartered 75%-80% of the year. His calculations estimated a total of $1.7 to $1.9 million loss for the delivery delay between May of 2013 and January 2014.[42]
lanThomas Picou, retained by The Grand and accepted as an expert in the limited field of Carboline paint application, testified concerning the Carboline paint application process. He testified that he was the Carboline representative involved in the Brazos project, which he described as unorganized. He testified that Semco did not timely notify him for inspections and that he was unable to inspect all areas because Semco employees had already painted some areas prior to prep inspection. Picou presented photographs of areas of the Brazos where he stated it appeared Semco failed to properly clean the surface and painted over a thin layer of dirt, as well as areas in the tank room where Semco, essentially, “missed” spots. He further presented a photograph which reflects that, in one area, Semco employees painted over a piece of painter’s masking tape and some areas were uncured, meaning the paint had not been properly mixed prior to application.
Picou testified to his opinion that Semco failed to follow the Carboline application process on the Brazos project. On cross-examination, Picou acknowledged that none of his monthly written inspection reports from December 2012 through September 2013, with the exception of one September 2013 report requiring additional work in the tank room, reference any concern or issue with the paint application process for the project.
Thor Jones, an expert in marine surveying and appraisal, testified that Prosperity Bank, from which The Grand obtained construction financing, retained him to conduct a valuation of the Brazos prior to its construction.[43] Jones reviewed the contract between the parties and testified that, generally, “if you are trying to appraise something new.. .you look at the contract, be-, cause that’s what it cost.” He conducted a fair market valuation of the Brazos and valued the Brazos, pre-construction, at $19,750,000,00. He testified that the contract price was a “good” |B1 price.[44] Jones testified that he is unaware of any 230 class liftboat with an appraised value of over $30 million. Jones testified that the insurance company also retained him to perform an updated survey in August 2014, following the tugboat collision, and that his valuation remained at $19,750,000.00.[45]
Jones testified concerning a spreadsheet prepared by The Grand for additional work it claims was necessary after delivery of the Brazos. The spreadsheet contains estimates for work The Grand contends Semco failed to perform as provided in the *1028 contract in addition to work The Grand contends became necessary after delivery due to Semco’s failure to properly complete the vessel. Jones testified to his understanding that “some” of the work estimated on the spreadsheet had actually been performed but, that The Grand had not performed all of the work referenced in the spreadsheet.
For example, Jones testified that The Grand incurred a “hard” $57,500.00 in costs related to the clutch repair and $30,000.00 to repair improper hosing on all three hydraulic manifolds in the engine rooms.[46] He further testified that The Grand contracted with B & R Sandblasting to drain, clean, and to repaint the ballast tanks after delivery and paid B & R a total of $48,000.00, which he testified is a fair and reasonable price. He also discussed a $2,828.95 invoice from Carboline paint for paint materials used.[47] Concerning The Grand’s claim for defective paint application, Jones testified that The Grand’s $969,312.25 estimate to completely sandblast and repaint the hull and interior compartments of the Brazos, including the watertight tanks, in his opinion is a fair and reasonable estimate.
|S2On cross-examination, Jones testified that he is not a paint expert and was not retained to testify as to whether the repainting of the hull and deck was necessary—or whether any of the alleged repair work was necessary or Semco’s responsibility—but only to testify as to whether the estimated price to do certain work was fair and reasonable.[48]
LAW AND ANALYSIS
Both parties have appealed the trial court judgment. Semco challenges the jury verdict in its favor, contending that the award is abusively low, and further challenges the verdict in favor of The Grand, contending the award is abusively high. Additionally, Semco contends that the trial court erred in its judgment awarding judicial interest from the date of judgment rather than the date of demand. The Grand, in its appeal, seeks review of the trial court’s denial of its pre-trial motion for partial summary judgment on several of Semco’s claims, as well as the denial of its motion for directed verdict on those same claims. The Grand further seeks review of evidentiary rulings and the trial court’s denial of its request to include certain jury instructions at trial. Lastly, The Grand challenges the jury award in favor of Semco, contending that the award is abusively high. For the following reasons, we amend the trial court judgment to award Semco judicial interest from the date of judicial demand. In all other respects, we affirm.
This litigation arises out of the parties’ January 30, 2012 written contract. A contract is defined as “an agreement by two or more parties whereby obligations are created, modified, or extinguished.” La. C.C. art. 1906. Interpretation of a contract is the determination of the common intent *1029 of the parties, and courts are obligated to give legal effect to contracts according to the true intent of the parties. La. C.C. art. 2045.
IsaThis Court has stated:
The true intent of the parties to a contract is to be determined by the words ■of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. LSA-C.C. art. 2046. In such case's, the meaning and intent of the parties to the written contract must be sought within the four comers of the instrument and cannot be explained or contradicted by parole evidence. LSA-C.C.art.1848. Contracts, subject to interpretation from the instrument’s four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the .same parties. LSA-C.C. art. 2053. Whether a- contract is ambiguous or not is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown.
Kappa Loyal, L.L.C. v. Plaisance Dragline & Dredging Co., Inc., 03-124, pp. 6-7 (La.App. 5 Cir. 6/19/03), 848 So.2d 765, 769.
A written contract may be modified orally by mutual consent demonstrated through the parties conduct. Cajun Constructors, Inc. v. Fleming Constr. Co., 05-2003, p. 8 (La.App. 1 Cir. 11/15/06), 951 So.2d 208, 214; see also Pelican Electrical Contractors v. Neumeyer, 419 So.2d 1 (La. App. 4th Cir. 1982), writ denied, 423 So.2d 1150 (La. 1982). Louisiana jurisprudence has found that, “written contracts for construction may be modified by oral contracts and by the conduct of the parties, and this is true even when the written contract contains the provision that the owner is liable only if the change orders are in writing.” Cajun Constructors, Inc., 951 So.2d at 214, quoting Pelican, supra, 419 So.2d at 5. Modification can be presumed through silence,. inaction, or implication. Cajun Constructors, Inc., supra. However, one person may not modify the contract terms | S4unilaterally. Id. Whether the parties reached oral agreements to modify a written contract is a question of fact. Pelican, supra, 419 So.2d at 5.
“A contract is formed by the consent of the parties established through offer and acceptance.” La. C.C. art. 1927. A contract has “the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law.” La. C.C. art. 1983; Peironnet v. Matador Res. Co., 12-2292, p. 18 (La. 06/28/13), 144 So.3d 791, 806. Consent may be vitiated by error, fraud, or duress. La. C.C. art. 1948.
The Louisiana Supreme Court has stated that error vitiates consent in one of two ways: mutually, where both parties are mistaken, or unilaterally, where only one party is mistaken. When the mistake is unilateral, such error will vitiate consent *1030 only if the other party knows or should have known that “the matter affected by the error'was the cause of the obligation for the party in error, that is, that it was the reason he consented to bind himself,” La. C.C. art. 1949, Revision Commentsl984, cmt, (c) West 2017; Peironnet, 144 So.3d at 807. Where there is no consent, there is no meeting of the minds and, thus, no enforceable contract. Ricky’s Diesel Serv. v. Pinell, 04-0202, p. 4 (La.App. 1 Cir. 2/11/05), 906 So.2d 536, 538; see also Hotard Gen. Contr., Inc. v. Crane, 08-0329 (La. App. 4 Cir. 10/29/08), 2008 WL 8919976, La. App. Unpub. LEXIS 717, writ denied, 08-2790 (La. 2/20/09), 1 So.3d 496.
When consent is vitiated by bilateral error, the relief granted may be either rescission, or alternatively, reformation of the contract to reflect the parties’ true intent. Peironnet, 144 So.3d at 807. Rescission is permitted even where the error is unilateral, however, the error must be excusable, meaning “the party in error did not fail to take elementary precautions that would have avoided his falling into error[.]” Id. at 810. Whether a unilateral error is excusable is determined according to the particular circumstances surrounding each case. Contractual | ^negligence, such as failure to read a contract one signed, is not excusable and, thus, rescission is not an appropriate remedy. Id. Further, an error made by a professional, concerning a matter directly within his field of expertise, would be regarded as inexcusable error and, thus, rescission for such unilateral error is not appropriate. Id.
If rescission is granted, there is no enforceable contract and the equitable doctrine of unjust enrichment may apply. A claim for unjust enrichment is based upon the equitable principle that a “person who has been enriched without cause at the expense of another person is bound to compensate that person.” La. C.C. art. ■2298; see also Indus. Cos. v. Durbin, 02-0665, p. 7 (La. 01/28/03), 837 So.2d 1207, 1213. The remedy of unjust enrichment is subsidiary in nature, and “shall not be available if the law provides another remedy[.]” Walters v. Medsouth Record Mgmt., LLC, 10-0351 c/w 10-0352 c/w 10-0353, p. 1 (La. 06/04/10), 38 So.3d 245, 246. To prove unjust enrichment, the following five requirements must be present: “(1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection - between the enrichment and the resulting impoverishment; (4) there must be an absence of ‘justification’ or ‘cause’ for the enrichment and impoverishment;. and (5) there must be no other remedy at law available to plaintiff.” Indus. Cos., 837 So.2d at 1213-14, citing Carriere v. Bank of Louisiana, 95-3058, p. 17 (La. 12/13/96), 702 So.2d 648, 651.
Moreover, the detrimental reliance doctrine bars a party from “taking a position contrary to his prior acts, admissions, representations, or silence.” Allbritton v. Lincoln Health Sys., 45,537, p. 5 (La.App. 2 Cir. 10/20/10), 51 So.3d 91, 95, citing Suire v. Lafayette City-Parish Consol. Govt., 04-1459 (La. 4/12/05), 907 So.2d 37. Stated another way, a party may be obligated by a promise he makes when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so | ^relying. Recovery under this principle may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a ■ change in position to one’s detriment because of the reliance, Luther v. IOM Co., LLC, 13-0353, *1031 pp. 9-10 (La. 10/15/13), 130 So.3d 817, 825; Suire, 907 So.2d 37, 59.[49]
On appeal, The Grand first challenges the trial judge’s denial of its pre-trial motion for partial summary judgment, as well as the trial judge’s denial of its' motion for directed verdict on the same claims. On July 31, 2015, the Grand filed a motion for partial summary judgment, seeking dismissal of Semco’s claims for (1) any compensation or damages related to Semco’s obligation to construct the Brazos under 200 gross tons; (2) reformation or rescission of the contract at issue due to alleged unilateral or mutual error; (3) total , cost damages; and (4) any delay damages or consequential damages pled, asserting that Semco expressly waived those damages in the contract.
In support of its motion, The Grand argued that the clear terms of the contract required Semco to construct a vessel under 200 gross tons and that Semco was responsible for any additional or unforeseen costs related to achieving the contracted tonnage. Concerning Semco’s total cost claim, The Grand argued that Semco could not recover its total cost to build the Brazos because at least a portion of the cost overruns were admittedly attributable to Semco. As to Semco’s reformation .and rescission claims, The Grand argued that Semco could not prove mutual error as to the object of the contract by clear and convincing evidence nor, | S7as a professional builder of liftboats, any excusable unilateral error as to the object and price of the contract.
Semco filed an opposition to the motion, asserting that the practicality of achieving tonnage, under 200 gross tons for the Brazos was a highly contested factual issue. Semco pointed to the tonnage provision in the contract, providing for the possibility of additional costs arising from tonnage calculations. Semco.also pointed to various deposition testimony, including Powers’ testimony, wherein he stated that he informed Springob of issues concerning tonnage and .that Springob repeatedly told him to continue building the boat and not to cut corners. Semco asserted, therefore, that the contract' provided for potential additional costs relating to tonnage and the issue of “who was at fault for”, any changes in design or construction, was a finding of fact to be determined at trial.
On August 28, 2015, the trial court denied The Grand’s motion for partial summary judgment. Following the presentation of Semco’s case-in-chief, The Grand moved for'directed verdict on the same claims, which the-trial judge''denied. On appeal, The Grand asserts that the trial court erred- in denying its motion for partial summary judgment, as well as its motion for directed verdict on these' claims.
Concerning motions for summary judgment, the Louisiana Supreme Court has stated:
[A] motion for summary judgment is a procedural device used when there is no genuine issue of material.f^ct for all or part of the relief prayed for by a litigant. An issue is genuine “if reasonable persons could disagree.” A fact is “material” when its existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of *1032 recovery. Any doubt as to a dispute regarding a genuine issue of material fact must be resolved against granting the motion and in favor of a trial on the merits.
Nevertheless, summary judgments are favored under the law as they are designed to secure the just, speedy, and inexpensive determination of every action. Accordingly, rules are liberally construed to accomplish these ends, and a motion for summary | adjudgment will be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.”
Initially, the burden of producing evidence at the hearing on the motion for summary judgment is placed on the mover who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent’s case. “At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial.” Thus, “[ojnce the motion for summary judgment has been properly supported by the moving party, the failure of the nonmoving party to produce evidence of a material factual dispute mandates the granting of the motion.”
Oubre v. Louisiana Citizens Fair Plan, 11-0097, pp. 20-21 (La. 12/16/11), 79 So.3d 987, 1002-03. [Citations omitted.]
Concerning motions for directed verdicts, this Court has stated:
A motion for a directed verdict is a procedural device available in trials by jury with an eye toward judicial economy. Reed v. Columbia/HCA Info. Sys., Inc., 00-1884 (La.App. 5 Cir. 4/11/01), 786 So.2d 142, 145, writ denied, 01-1384 (La. 6/22/01), 794 So.2d 796. The motion is appropriately made at the close of the evidence offered by the opposing party and should be granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant’s opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary result. Id. However, if there is evidence produced in opposition to the motion that has such quality and weight that reasonable and fair-minded men, exercising impartial judgment, might reach different conclusions, then the motion should be denied and the case should be submitted to the jury. Id.
The trial court has much discretion in determining whether or not a motion for a directed verdict should be granted. Joseph v. Cannon, 609 So.2d 838, 843 (La. App. 5 Cir.1992), writ denied, 623 So.2d 1330 (La.1993), cert. denied, 510 U.S. 1097, 114 S.Ct. 935, 127 L.Ed.2d 226 (1994). The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable people could not reach a contrary result. Reed, supra at 146. Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law related to the claims. Id.
Baudy v. Travelers Indem. Co. of Conn., 13-832, pp. 8-9 (La. App. 5 Cir. 04/09/14), 140 So.3d 125, 131.
| sgFirst, considering Semco’s claim for damages related to additional costs associated with achieving tonnage under 200 gross tons, we find the trial court was correct in denying The Grand’s motion for partial summary judgment and motion for *1033 directed verdict as to that claim. The issue of whether Semeo is entitled to compensation for additional costs related to achieving tonnage was a highly contested issue of fact best preserved for the jury’s determination. As discussed infra, the contract between the parties contained a unique and somewhat ambiguous provision specifically addressing the vessel’s tonnage requirements. The evidence presented at trial, as well as the deposition testimony relied upon at the summary judgment stage, demonstrated that there was a great deal of testimony and evidence to be weighed and considered in determining the parties’ intent surrounding that provision.
Second, considering Semco’s claims for reformation or rescission of the contract at issue, we find the trial judge did not err in denying The Grand’s motion for partial summary judgment or motion for directed verdict as to these claims. A thorough review of the record reflects ample testimony and evidence from which reasonable persons could disagree as to whether there was a “meeting of the minds” as to the contract price and, thus, whether there existed mutual or excusable unilateral error sufficient to vitiate consent. See Hotard Gen. Contr., Inc. v. Crane, supra; See also Ricky’s Diesel Serv., supra.
Third, as to Semco’s total cost claim, we find that the trial court did not err in its denial of The Grand’s motion for partial summary judgment or directed verdict as to that claim. The requirements to recover the total cost of construction in a breach of contract case are: 1) impracticability of proving actual losses directly; 2) reasonableness of the bid; 3) reasonableness of actual costs; and 4) lack of respon-sibility for added costs. T.L. James & Co. v. Traylor Bros., 2000 WL 322777, 2000 U.S. Dist. LEXIS 4378 (E.D. La. Mar. 23, 2000), citing Dawco Construction, Inc. v. United States, 930 F.2d 872 (Fed. Cir. 1991). At trial, Semeo presented expert testimony to show that determining damages in connection with the Brazos project was extremely difficult to calculate. Coney-bear testified that it was nearly “impossible” to “differentiate the changed work from the unchanged work and separately collect the cost for the changed work” on this type of project, although he did testify ultimately to an estimate of costs related to changed work.[50] Further, Semeo presented expert testimony that the construction costs for the Brazos were reasonable. Moreover, the parties presented conflicting testimony as to which party was responsible for the construction changes and the consequential delays. Thus, we find the trial court did not err in finding there remained factual issues for the jury’s determination. Nevertheless, the jury verdict reflects that the jury in this case did not award damages under the total cost method.
Lastly, we find the trial court did not err in denying The Grand’s motion for partial summary judgment or directed verdict as to Semco’s claim for consequential damages. The January 30, 2012 contract provided a provision entitled “Waiver of Consequential Damages,” stating that the parties waived the right to seek any indirect or consequential damages. Waiver provisions similar to the provision in the contract at issue are “commonly understood to prohibit damages characterized by their ‘unforeseeability or remoteness’ to a *1034 breach and is synonymous with, the term ‘special damages.’” Olympia Minerals, LLC v. HS Res., Inc., 13-2637, p. 36 (La. 10/15/14); 171 So.3d 878, 901, citing 6 Saul Litvinoff & Ronald J. Scalise, Jr,,. Louisiana ;Civil Law Treatise: The Law of Obligations § .17, p. 127.' The Louisiana Supreme Court has stated that damages “foreseeable from a breach of contract” are not excluded as consequential damages. Id.
|41In response to The Grand’s motions, Semco argued that it sustained actual and direct disruption damages, as a result of The Grand’s failure to comply with the contract’s change order approval provision. Without opining on the issue of whether such damages are prohibited or contemplated under the contract, we And that the trial court was correct in denying The Grand’s motions seeking to dismiss Sem-co’s claim for such damages. As discussed above, we have found that Semco’s claim for rescission of the contract at, issue was properly put before the jury. Had the jury found mutual or- excusable unilateral error in this case, the contract as written would be unenforceable. We find, therefore, that the trial court was correct in denying The Grand’s motion for partial summary judgment and motion-for directed verdict as to Semco’s disruption and delay damages. This assignment is without merit.
Next, The Grand assigns as error the trial court’s denial of its request for certain jury charges. Prior to the completion of trial, The Grand objected to the jury charges on several grounds. Pertinent to this appeal, The Grand sought to instruct the jury on the law pertinent to fixed-price or lump-sum contracts, or that “where one agrees to do for a fixed sum a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered.” Further, the Grand sought to include a charge to the jury “that industry customs may be considered when construing ambiguous contracts, and deviation from industry customs should be expressly stated in the agreement.” The Grand contends that the trial court’s failure to instruct the jury on these legal principles contributed to the verdict and asks this Court to set aside the jury verdict and conduct a rife novo review.
La. C.C.P. art. 1792(B) provides that the trial court shall instruct the jury on the law applicable to the case. Trial courts are given broad discretion in formulating jury instructions and a judgment will not be reversed so long as the | ^instructions “adequately provide the correct principles of law as applied to the issues framed in the pleadings and evidence[.]” Peironnet, 144 So.3d at 817, The Louisiana Supreme Court has instructed:
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should riot be reversed so long as the charge correctly states the substance of the law.- The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part,- on respect -for the-jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions- provided by the judge.
However, when a jury is erroneously instructed and the ¡error probably contributed to the verdict, an appellate *1035 court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, .the determinative question is whether the jury instructions misled the jury to the extent that it , was prevented from dispensing justice.
* * *
Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge’s instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as, a whole and the circumstances of the case. Brown [v. White ], 405 So.2d [555] at 558 [ (La.App. 4 Cir.1981) ].
Adams v. Rhodia, Inc., 07-2110, pp. 6-8 (La. 05/21/08), 983 So.2d 798, 804-05.
On appeal, The Grand argues that the trial court erred in denying its request to instruct the jury on the law applicable to fixed-price contracts. Specifically, the law provides that “where one agrees to do for a fixed sum a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered.” Brasher v. Alexandria, 215 La. 887, 915, 41 So.2d 819, 829 (1949). Further, in interpreting construction contracts, the.,law provides that “on a lump contract it is possible that the contractor’s anticipated and expected profit may turn into a loss because of a low bid or the rising prices of materials and/or labor.” MKR Servs., L.L.C. v. Dean Hart Constr., L.L.C., 44,456, p.5 (La.App. 2 Cir., 7/8/09), 16 So.3d 562, 564 (wherein the contract at issue repeatedly referred to the contract as a “Lump-Sum Contract” and discussed an inflexible written change order provision), citing Standard Oil Co. of Louisiana v. Fontenot, 198 La. 644, 670, 4 So.2d 634, 643 (1941). Relatedly, The Grand argues that the' jury instructions on detrimental reliance and quantum meruit were improper because the contract at issue is not ambiguous and' is a fixed-price contract.
Upon our review, we find that the trial court did not abuse its discretion in denying The Grand’s request for an instruction on the law governing fixed-price or lump-sum contracts. The record reflects that, although The Grand repeatedly referred in its pleadings to the contract at issue as a lump-sum or fixed-price contract, it did not file a motion for partial summary judgment as to this issue prior to trial. Interpretation of a contract and, specifically the issue of whether a contract is ambiguous, is a question of law properly determined at the summary judgment stage. Security Ctr. Protection Services v. Lafayette Sec. & Elec. Sys., 95-693 (La.App. 5 Cir. 01/17/96), 668 So.2d 1156, 1160; See also Russellville Steel Co. v. A & R Excavating, 624 So.2d 11, 13 (La. App. 5th Cir. 1993).
Nevertheless, we find as a matter of law that the contract at issue is not'a fixed-price contract. The tonnage provision in the contract, which provides generally for a “negotiation” of “additional cost” to the contract price without stringent or specific criteria'or limitations, is ..an ambiguous provision relative to the contract price. *1036 The contract sets forth a vague and flexible means by which the contract price may be negotiated and amended upon an agreement, not required to |44be in writing, between the parties. This unique contract provision supports a determination that, as a matter of law, the contract at issue is not a fixed-price contract. Accordingly, we find the trial judge did not abuse his discretion in denying The Grand’s request to instruct the jury on the law governing fixed-price contracts.
The Grand further contends that the jury should have been instructed on the applicable law that “industry customs may be considered when construing ambiguous contracts, and deviation from industry customs should be expressly stated in the agreement.” Although the requested instruction is relevant and applicable to the facts of this’ case, we point out that the jury heard expert testimony concerning industry customs and we find that the jury instructions given as a whole “adequately provide[d] the correct principles of law as applied to the issues framed in the pleadings and the evidence” and “adequately guided the jury in its deliberation.” Adams, 983 So.2d 798, 804-05. We do not find that the omission of this single charge prevented the jury from dispensing justice in this case. Id. This assignment is without merit.
The Grand further challenges the trial judge’s exclusion of a 2011 judgment in an unrelated case, wherein Semco was ordered to pay the Jefferson Parish Sheriff $319,147.23 in past due taxes. The Grand alleges the tax judgment is relevant to show that Semco had financial difficulty at the time it contends that Semco unilaterally increased the price of the Brazos project. “The trial court is vested with wide discretion in determining relevancy of evidence and its ruling will not be disturbed on appeal absent a showing of manifest abuse of that discretion.” Abadie v. Metro. Life Ins. Co., 00-344, p. 32 (La.App. 5 Cir. 03/28/01), 784 So.2d 46, 73. Upon our review of the record, we find no abuse of the trial court’s vast discretion to exclude a tax judgment against Semco in an | ^unrelated case and executed prior to the contract at issue. This assignment is without merit.
On appeal, both parties challenge the amount of the jury award in Semco’s favor. Semco argues that the award of damages in its favor has no reasonable factual basis and is abusively low, whereas The Grand contends the award is abusively high and not supported by law. Semco further challenges the jury award in favor of The Grand, contending that the award is abusively high. The Grand, however, does not seek review or modification of the amount of the jury award in its favor.
Related to the jury’s award of damages in favor of Semco, Semco argues that it presented fact and expert testimony to prove that it performed extra work on the Brazos pursuant to agreements between the parties for (1) redesigning the vessel to meet tonnage requirements; (2) installing an aluminum rather than a steel deck-house; (3) adding additional planetaries; (4) increasing the size of the vessel’s generators; and (5) increasing the load capacity and structural support for the crane. Semco argues that it presented expert testimony to prove that its damages ranged between $5,312,804.00[51] and $13,300,464.00 and contends that the jury’s award of $4,831,144.00, which is lower than the lowest possible amount of damages estimated *1037 and presented by its experts, is not supported by the evidence.[52] The Grand, in response, argues that the damages estimated by Semco’s experts included damages for extra work, which the jury could have reasonably found Semco was not entitled to. Thus, The Grand argues that Sem-co is not necessarily entitled to the lowest amount it sought.
Semco further appeals the $680,845.00 jury award in favor of The Grand, contending that the award is abusively high. Sem-co contends that The Grand 14ñfailed to give timely notice of the defects as provided in the contract and further points to Coneybear’s expert testimony, wherein he estimated The Grand’s damages related to the contract to be $46,334.00. The Grand, in response, asserts that it provided notice to Semco of the alleged defects within the six-month warranty period in the contract and further points to its expert testimony estimating its damages related to the contract totaled $2,549,671.00. The Grand does not seek review of the jury’s award in its favor. The Grand contends that the jury award, well within the range of the expert testimony presented at trial, is reasonably supported by the record.
As pointed out by the parties in their appeal briefs, the jury interrogatories are somewhat ambiguous. The jury interrogatories simply asked the jury whether The Grand owed Semco “any amount” in addition to the amount already paid pursuant to the contract. The interrogatories further asked whether Semco owes The Grand “any amount related to the contract between the parties.” Therefore, it is unclear which claims or upon which theory of liability—detrimental reliance, a finding of subsequent oral modifications to the written contract for some but not all changes, contract rescission, unjust enrichment— the jury- awarded damages to Semco. Further, as to The Grand, the jury verdict sheet does not specify which claim or claims for which the jury awarded damages. The jury verdict sheet in this ease is also somewhat ambiguous and does not question the jury concerning all of Semco’s various claims presented, nor upon which theory or theories the, jury ultimately based its award.[53]
However, a careful review , of the record reflects that neither party objected to the form of the jury interrogatories or verdict sheet. Although both parties submitted proposed jury instructions and The Grand submitted detailed jury interrogatories, the trial court did not submit the proposed interrogatories to the |47jury. The interrogatories ultimately provided to the jury did not question the jury as. to the reason or theory upon which the jury rendered its verdict in favor of Semco. In the absence of an objection to an ambiguous, confusing, or misleading jury interrogatory or verdict sheet, properly raised in the trial court, the issue has not been preserved for appellate review and we will not address it. See Himel v. State, 04-274, p. 5 (La.App. 5 Cir. 10/12/04), 887 So.2d 131, 136; see also Arrington v. Galen-Med, Inc., 02-987 (La.App. 3 Cir. 2/5/03), 838 So.2d 895, 900.
The jury verdict sheet, which fails to set forth whether the jury awarded damages in favor of Semco under a contractual claim or a rescission and unjust *1038 enrichment claim,, creates.some difficulty for this Court to- review the damages awarded. Nevertheless, although it is helpful for this Court upon review to be able to determine exactly why or how the jury reached its award of damages,' it is not legally required. Monte v. State Farm Mut. Auto. Ins. Co., 13-979, p. 12 (La.App. 3 Cir. 5/21/14), 139 So.3d 1139, 1148.
The Louisiana Supreme Court has set forth the standard of review for an appellate court in reviewing a jury’s factual findings to support its determination that a party is entitled to damages:
An appellate court, in reviewing a jury’s factual conclusions, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong'. Kaiser v. Hardin, 06-2092, pp. 11-12 (La. 4/11/07), 953 So.2d 802, 810; Guillory v. Insurance Co. of North America, 96-1084, p. 5 (La. 4/8/97), 692 So.2d 1029, 1032. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury’s fact finding conclusion was a' reasonable one. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989); Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1973).
Notably, reasonable persons frequently disagree. Guillory [v. Lee], 09-0075 at pp. 15-16 [ (La. 6/26/09) ] 16 So.3d [1104] at 1117. However, where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. Peironnet, 144 So.3d at 817-18.
|4SIn reviewing the amount of a jury’s award of damages, a reviewing court should review the jury’s calculation or determination of the amount of .the award for an abuse of discretion. Audubon Orthopedic & Sports Med. v. Lafayette Ins. Co., 09-0007, p. 25 (La.App. 4 Cir. 04/21/10), 38 So.3d 963, 980; see also Ezzell v. Miranne, 11-228 (La.App. 5 Cir. 12/28/11), 84 So.3d 641, 652.[54] If, on review, an appellate court finds a reasonable factual basis to support the jury’s verdict, it must affirm. Ezzell, supra.
Upon our review, we find there is a reasonable factual basis to support the jury’s verdict. Because we have found, as discussed above, that the contract at issue contains an ambiguous provision, the parties’ intent must-be determined through the testimony and evidence presented at trial—which determination rests greatly on credibility and factual findings. Contrary to The Grand’s assertions on appeal, we find there is a reasonable factual basis to support a verdict in Semco’s favor. For example, the jury may have determined that the parties reached oral agreements which modified the parties’ written contract as it related to tonnage and other changes. Alternatively, or additionally, the jury may have determined that Semco was entitled to compensation for additional work because Powers was justified in his reliance on Springob’s assurances, and promises that he would “not hurt” Semco and on his instructions to “keep building the boat.” Nesser testified that Springob “very commonly” relayed similar statements and assurances to Powers, and other witnesses corroborated this testimony. The testimony reflected that Powers and Springob were friends who had conducted business together for decades. The jury may have found that Powers relied upon Springob’s promises or assurances to his *1039 detriment, and awarded damages for the extra work pursuant to a detrimental reliance claim.
|49Semco contends that it is entitled to the lowest amount of damages its experts claimed would compensate it for the additional work performed, including disruption and delay expenses. This argument presumes that the jury determined Semco was entitled to all damages claimed. However, the jury was free to reject any expert or fact witness’ testimony or to accept in part, but not in whole, any testimony presented at trial. For example, the jury could have reasonably found that Semco was responsible for a percentage of the costs its expert attributed to disruption or delay and refused to award the entire amount sought for that aspect of its damages. The jury could have reasonably concluded that a percentage of the disruption claim was attributable to Semco’s own actions in the delay of the tonnage design drawings or the delay in Semco’s working on another vessel at its yard near the end of the completion of the Brazos project. Certainly, the jury could have reasonably found that Semco proved several oral modifications to the contract for extra work or changes, but perhaps not as to each and every “change” Semco asserted. Alternatively, the jury could have reasonably refused to award damages to Semco for the difference in cost between aluminum and steel construction, possibly finding that the parties orally agreed to modify the contract to an aluminum deckhouse only to correct a typographical error in, or an omission from, the contract to reflect the parties’ pre-contract intent to build the deckhouse with aluminum.[55]
This Court, upon review, must only find a reasonable factual basis to support the jury’s award. Upon our review, .we find the jury did not abuse its discretion in its award of damages in favor of Semco.
We similarly find that there is a reasonable factual basis upon which to support the jury’s award in favor of The Grand. On appeal, The Grand does not |CTseek review or modification of the jury award in its favor. Semco, in its appeal, contends that the jury award in The Grand’s favor is abusively high. Upon our review of the record, we find, based upon Hebert and Jones’ testimony concerning The Grand’s warranty claim for repair to the clutch, as well as the evidence presented reflecting defective paint application, which reasonably required paint application correction, that the jury’s award is factually supported by the record.
Finally, Semco assigns as error on appeal the trial court’s judgment awarding judicial interest from the date of judgment rather than from the date of judicial demand. Because this case arises out of the parties’ contract, although alternative theories of recovery were presented, we find that the trial court abused its discretion in awarding judicial interest from the date of judgment and that judicial interest from the date of demand, as sought by Semco, is appropriate. See Odeco Oil & Gas Co. v. Nunez, 532 So.2d 453 (La. App. 1st Cir. 1988).
DECREE
For the foregoing reasons, we amend the trial court judgment to award Semco judicial interest from the date of demand rather than from the date of judgment. In *1040 all other respects, we affirm the judgment of the trial court.
AFFIRMED AS AMENDED

. Semco’s original petition also set forth a claim to enforce a lien against the vessel.

. In its amended reconventional demand, The Grand also named John Powers, Semco’s founder, individually as a defendant-in-recon-vention, asserting claims of intentional interference with contract as well as claims under the Louisiana Unfair Trade Practices Act..The jury considered and rejected those claims. The Grand does not appeal that portion of the judgment and those issues are not before this Court on appeal.

. On the same date, Powers and Semco filed motions for partial summary judgment as to The Grand’s claim for intentional interference with contract as well as those claims arising out of the Unfair Trade Practices Act. On August 28, 2015, the trial judge denied Powers’ and Semco’s motions for partial summary judgment, and that portion of the judgment is not before this Court on appeal.

. The expert testimony at trial explained that ■tonnage is not a vessel’s weight. Rather, it is a volumetric calculation of the vessel’s cargo-carrying potential.

, The contract provided a means by which the • parties could add additional authorized dgents to approve changes or modifications to the contract, which required written notice by Powers or Springob in accordance with 'the contract's written notice provisions.

. Both parties also presented evidence concerning change orders, including a disputed but paid change order for additional planetar-ies Semco deemed necessary during construction.

. Powers testified that Semco at the time was the only company in the country that built liftboats and sold them internationally.

.However, Christian Pierce, Semco’s naval architect, testified that it is difficult to retain an expert to conduct significant work and to incur significant expense for that expert without a written contract.

. Powers acknowledged that the April 2013 email is the first written notification to The Grand of the increased construction costs but that he verbally discussed the issue with Springob and Rnoulton at their January 2013 meeting.

. Powers testified that the generators installed on the Brazos were larger than those provided for in the contract because Semco determined that the generators in the specifications were not sufficient to maintain the vessel after a load analysis. Powers testified that Springob, pre-contract, wanted Powers to attempt to use the smaller generators at a lower cost, but that he warned Springob that he was unsure the smaller generators could handle the load of the vessel. Concerning the crane, Powers testified that Springob repeatedly asked him if there was any way to increase the crane capacity. Subsequent to the contract, the American Petroleum Institute published its new 7th edition load charts, which permitted Semco to increase the crane’s lifting capacity. Powers stated that Rory Hebert, a Grand employee, during one of his visits to Semco’s yard, verbally instructed Allen Moore, Semco's naval architect, to use the enhanced crane load charts. Powers testified that Hebert had relayed approvals from Springob on numerous occasions.

. Powers acknowledged that he did offer to build The Grand two additional 230 class vessels for $17-$ 18 million dollars each. He testified that the contract vessel provided in the original specifications had a smaller crane and a steel cabin, and other less expensive features. He further stated that a second or third build of a vessel is always less expensive because it is no longer a custom build and the builder saves on the design end.

. In response to questioning from The Grand’s counsel as to why Powers did not simply deem rejected all change orders not timely approved, as provided in the contract, Powers stated that some of the changes were necessary to the function of the vessel and that consequently "we would be here based on other causes.” When questioned why he would not have simply refused to continue working on the boat until The Grand responded in writing to change requests, Powers testified, "I told them I was going to build the boat. I wasn’t going to cut comers and so I built the boat.”

.For example, Powers testified that Rory Hebert, a Grand employee, verbally approved the enhanced crane to Allen Moore, Semco’s engineer. Powers testified that Rory Hebert spoke on behalf of The Grand on numerous occasions. The record further contains an email from Christian Pierce, a Semco employee, to Powers indicating that Springob had visited the yard on numerous occasions and had instructed Semco employees to make changes and do additional work, which had increased Semco’s man-hours on the project. At some point in time, Powers instructed his employees not to communicate directly, with Springob or The Grand's representatives to avoid miscommunications.

. Powers testified that he would never have considered discussing the possibility of merging fleets with Springob if he did not consider him a friend.

. Powers testified that Springob wanted a Laredo representative to serve on the All Coast Board but required All Coast to sign an agreement that Laredo owed no fiduciary duty to All Coast. Because the two companies were competitors, Powers testified that essentially Laredo would have confidential information concerning All Coast's fleet and customers without any fiduciary duty to preclude it from using that information to Laredo’s benefit.

. Specifically, Springob testified concerning email correspondence he forwarded tó Allen Moore regarding changes and revisions to the contract, which Moore approved and relayed to Semco.

. As to the tonnage issues, Semco’s position was that its employees were not qualified to determine the exact cost increase related to the tonnage issue or design and that an expert was needed to calculate that cost.

.Tarn Springob—Bob Springob’s son, an attorney and President of Laredo' Construction—testified that, as late as August 2013, The Grand still had not been invoiced for the change orders they had approved in writing, totaling approximately $1,2 million.

. During the trial, Semco presented expert and lay testimony, discussed infra, to establish that any engineer would understand the concept that a crane’s increased lift capacity, which increases the radius at which a crane can lift, would increase the cost of construction because additional steel and other materials would be required to support the crane when extended farther out. Specifically, a Semco engineer explained that "the supporting structure for the crane had to be increased in order to handle the higher loads that the crane was putting into the boat.”

. Planetaries are installed to aid in the lift-boat’s hydraulic system so that the legs can properly lift the vessel above water. Allen Moore, a Semco employee, testified that the additional planetaries became necessary with the increased structure resulting from the crane’s increased lift capacity. In August, 2013, Steve Juul, a Semco employee and Powers’ son-in-law, sent Springob an email indicating that the Brazos project was delayed due to late arrival of equipment from La. Caterpillar, Springob stated that he responded to that email, by suggesting: (1). the possibility of' The Grand paying Semco's workers' overtime to get the boat completed . more quickly, and treating the overtime as extra costs; (2) The Grand paying any outstanding approved change orders, which he estimated to be approximately $1.2 million; ' and in the event that Semco was interested in ■ building two -additional boats for The Grand, he suggested that the negotiations for those boats commence before the completion of the Brazos.

.Springob additionally speculated that Powers continued to increase the cost of the Brazos after Powers viewed The Grand’s financial documentation in connection with the bid on the Derrick barge earlier in the year. Springob admitted that he-has no proof that Powers actually viewed the financial documentation, but stated that Nesser had the information arid presumed that he shared that information with - Powers. Springob testified that, at that time during discussions with Powers concerning merging with All .Coast to purchase the Hercules fleet, The Grand and Laredo companies were competitors, of both All Coast and Hercules. He admitted that, during that time, he reviewed All Coast’s confidential records and was privy to negotiations between All- Coast and Hercules con *1016 cerning the proposed Hercules fleet purchase. Springob further admitted that Knoulton forwarded correspondence to Powers concerning Laredo’s involvement with All Coast, which requested that Powers sign an agreement acknowledging that Laredo could have a representative sit on All Coast’s Board and attend meetings concerning business transactions, but that Laredo would owe no fiduciary duty to All Coast for confidential information obtained or learned at the All Coast meetings. Springob testified that the proposed agreement "held [Laredo and its representative] harmless from anything and everything.”

. Knoulton is also President of Laredo Offshore Services; Vice-President of Laredo Construction; and Director for Springob Enterprises.

. In her testimony, Knoulton incredulously contends that her father and Powers were not that close and were simply business acquaintances who had gone years without even speaking. On cross-examination, Knoulton acknowledges that in an email to Powers, dated October 23, 2013, she references her father and Powers’ 30-year friendship.

.Knoulton testified that she coincidentally met John Nesser’s wife, Cynthia Nesser, on an airplane and began discussing business with her. Knoulton testified that, from that conversation, she suspected that Powers did not want Springob or The Grand involved in any *1018 All Coast transactions. Cynthia Nesser testified at trial that she has a background in computer graphics and that she did not know anything about the All Coast deal, other than creating a dropbox for her husband to load and store financial documents in connection with All Coast. John Nesser testified at trial that he did not instruct his wife to place any of The Grand or Laredo’s confidential financial. documents into the dropbox and, to his knowledge, they were never placed into the dropbox that was shared with Powers, Nesser denied vehemently that he provided any of Springob’s confidential financial documentation to Powers.

. The tonnage expert in July 2012 also recommended a transverse framing scheme, which differed from the longitudinal framing scheme in the original drawings and created additional manhours as some of the framing work was completed and needed to be corrected,

. Moore also testified that, in August 2012, the Semco shipyard was affected by Hurricane Isaac and sustained water intrusion into the yard. He stated that the project was likely delayed by three weeks to one month as a result of Hurricane Isaac.

. Regarding Powers’ credibility, Phillip Gor-dillo, a Senior Banking Officer with Whitney Bank, testified that Powers has been a client for over 30 years and that the bank has extended financing to Powers on numerous occasions. Gordillo testified about the 5 "C’s” of financing: Character, Capacity, Capital, Conditions, and Collateral. He testified that Character is of utmost importance in the bank’s determination to extend financing.

. Babin also testified that The Grand delayed decisions on several construction issues or requests, including placement of the hydraulic power unit (H.P.U.). Babin reviewed an email from Semco's project manager, Steve Juul, inquiring about four separate items (the pilot house, microphone, additional command mies, and window selection) and recalled that Springob took quite some time to respond to those requests.

.This drafted document, introduced into evidence at trial, provided the following: (1) amended the contract price to $17,064,344.90 and attached the approved change orders totaling $1.1 million; (2) The Grand will inspect the vessel upon delivery and the warranty provisions provided in the original contract will remain valid upon delivery; and (3) the parties agree that the vessel construction cost has far exceeded the original contract price and agree that within one year of completion, the parties will sell the Brazos and all proceeds in excess of the adjusted contract price will be split equally between the two parties.

,Nesser further testified that, at some point in time, Springob contacted him to see if he would be interested in "coming over” to Laredo to assist in the purchase of the Hercules fleet without All Coast's involvement, to which Nesser replied that he could not "cut" Powers out of the Hercules fleet purchase, According to Nesser, he did not entertain . Springob’s offer. Nesser testified that Sprin-gob met with him and Powers on numerous occasions about purchasing the Hercules fleet but had not provided any commitment. On June 17, 2013, Nesser received a phone call indicating that All Coast had seven days to close on the deal for the Hercules fleet. Nes-ser testified that because they only had seven days to get all paperwork together, including financials, All Coast decided to move forward with the purchase of the Hercules fleet without Springob but left space in the operating Agreement for Springob to become a part of All Coast with both Springob and Knoulton having positions with All Coast. Nesser testified that one condition of the sale of the Hercules fleet was that Hercules wanted a clause in the contract stating that All Coast could not operate the Hercules fleet in Nigeria or the Middle East, which Nesser knew may cause more hesitation for Springob.

. Knoulton testified that she created the spreadsheet ■ setting forth all of the repair work and credit claims.

. Hebert acknowledged that the flooring has not been replaced.'

. Hebert testified that The Grand had to install a deck extension to access the generators because the design made it inaccessible to even check the oil in the engine. The cost of that work is estimated at $1,896.11. Similarly, The Grand built decking to access the radiators to perform maintenance on them, at a cost of $1,429.13 plus $3,500.00 in labor. On cross-examination, Hebert testified that the contract did not specifically, provide for access decking or panels and that Laredo employees added that decking on their own. He further discussed a broken boom light for $1,195.86.

. Connie Babin, a Laredo employee in the sales and operations division, testified that she was responsible for marketing the Brazos and securing charter contracts for Laredo's fleet. In March 2013, Juul forwarded correspondence to her to inform her that the Brazos’ original delivery date was delayed due to "stumbling blocks trying to keep the boat under 200 gross tons” and that he did not expect the boat to be completed until late June. Ms. Babin testified that she most definitely would have forwarded this type of correspondence to Knoulton, her supervisor, to let her know of the delay. Ms. Babin testified that she began marketing the Brazos to be available late June and that there was "a lot of interest in the Brazos.” Ms. Babin presented multiple charter quotes that she provided to various companies interested in .the Brazos. None of the quotes resulted in a charter contract; Ms, Babin stated that none of the companies signed the short form quotes because the boat was not completed in June as expected. Ms. Babin testified that 2013 was a very good year for charters, stating that a day rate for a boat similar to the Brazos would be $28,000.00-$32,000.00 and, by 2015, because of fuel prices and other factors, the day rate had dropped to approximately $15,000.00. She further testified that Lare.do chartered its fleet approximately 46%-71% of the year.

. Several photographs of the paint damage were introduced into evidence, reflecting areas of paint chipping and small areas of rust in the tank area.

. He also testified that Semco is a smaller shipyard. He explained that a smaller shipyard such as Semco would not necessarily have a critical path schedule because "most small shipyards do not.. .it is costly.” He further testified that he creates cost proposals for larger shipyards and ship building companies and that, at times, the cost proposal alone costs millions of dollars.

. Mr. Coneybear attributed $1,034,000.00 in increased cost due to incremental costs related to the crane chart modification to allow the crane to reach out farther.

. Powers testified that Semco typically uses a standard set of designs when contracted to build a vessel; however, the Brazos project required a custom design for its build.

. Bourg acknowledged that Mody’s design was approved by the Coast Guard.

. ' Bourg also acknowledged that the majority of oil companies at this time only request or desire the API certification and .not necessarily the ABS certification.

.The actual delivery date was December 24, 2013. However, The Grand contends that its crew spent 30 days working,on the vessel to correct defective workmanship before" the Brazos could be contracted offshore.

. Mulvihill stated that he deducted 16 days for a government shutdown which resulted in no charters for those dátes.

. Jones testified concerning the most important characteristics of a liftboat: the leg length, (class of boat); the crane lift capacity; deck load capacity (the amount of weight a deck can hold while jacked up); open deck space (which allows workers room to work); and accommodations (how many workers can sleep aiid work on the boat).

. Jones testified that by "good” he means , "legitimate” and fair. ■ . ■

. Jones testified that he was. unaware that the vessel is insured for $21 million.

.With respect to the clutch issue, Ken Malo-ney, an expert in marine engineering and naval architecture, testified that he accompanied Moore and Laredo representatives to the Brazos in August 2014 to inspect the vessel to determine the causation of the clutch defect. Maloney testified at trial that he inspected the actuator, and determined that the clutch needed to be moved down. He testified that he fixed the clutch issue and is unaware of any problems with the clutch since that time.

. The Grand farther estimated $48,100.00 to pressure wash the tanks and touch up paint in the defective areas and $38,990.00 to sandblast and resurface the main deck.

. Further, Jones testified that he could not opine on whether the $54,656.17 for work performed on the crane was fair and reasonable as he is not a crane expert.

. A formal, written contract is not required to assert a detrimental reliance claim. Rather, detrimental reliance is most asserted in cases where a formal contract does not exist. Bach v. Bd. of River Port Pilot Comm’rs, 15-765 (La.App. 5 Cir. 5/12/16), 193 So.3d 355, 364 n.8. Nevertheless, even where a formal written contract exists, if the contract is ambiguous and further interpretation is required to determine the parties’ contractual intent, at the time of execution of the contract as well as any subsequent modifications to the contract, a detrimental reliance claim may be available. , - -

. Nierenberg and Coneybear testified that disruptive changes typically cost more than the cost of the actual change itself because it interrupts construction and, sometimes, requires workers* to sit idle during those delays. Coneybear testified that these additional costs are very difficult to estimate.

. This figure is the total amount attributable to the changes, as calculated by Coneybear, minus the amount The Grand paid on the disputed change order relating to the change in the number of planetaries.

. The Grand, in response,, argues that it is inappropriate for Semco to contend that the range of damages available rises to $13,300,464.00 because the jury verdict reflects that the jury rejected Semco’s total cost claim.

. The jury verdict sheet does question whether Semco proved that reformation of the contract is appropriate but does not question whether rescission was granted or damages awarded pursuant to any equitable.theory of recovery.

. Where a jury awards special damages, or those established to a reasonable mathematical certainty, a jury’s discretion is more limited but its award is still reviewed for an abuse of discretion. Ezzell, 84 So.3d at 652.

. The jury may have reasonably deducted the $419,995,00 reflected in Coneybear's estimate for the actual cost of materials and subcontractors for the aluminum versus steel construction and may have rejected Coney-bear's estimate that the material change from aluminum to steel necessitated 8,073 additional man-hours.